**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Gene E. STONE, Defendant–Appellant.**

No. 91–3237.

United States Court of Appeals,
Sixth Circuit.

Argued Sept. 24, 1991.

Decided Jan. 27, 1992.

Thomas A. Karol, Asst. U.S. Atty. (argued), Office of the U.S. Atty., Western Div., Toledo, Ohio, for plaintiff-appellee.

Jerome Phillips, Wittenberg & Phillips, Scott E. Spencer (argued), Toledo, Ohio, for defendant-appellant.

Before MARTIN and JONES, Circuit Judges, and BROWN, Senior Circuit Judge.

NATHANIEL R. JONES, Circuit Judge.

Defendant Gene E. Stone appeals his conviction under the bank fraud statute, 18 U.S.C.A. § 1344 (West Supp.1991). For the reasons that follow, we affirm the judgment below.

## I

The facts giving rise to this appeal are for the most part uncontested. Prior to his conviction, Stone operated several small corporations in Ohio and Michigan. For many years, Stone maintained numerous checking accounts for these businesses at the Ohio Citizens Bank ("OCB") and the Mid American National Bank ("Mid American"), both located in Toledo, Ohio. In the latter part of 1988, Stone's businesses began experiencing financial difficulties; to alleviate short-term cash-flow problems, Stone began kiting checks.[1]

According to account statements introduced at trial, Stone deposited over $400,000 into his accounts at each of the two banks in January 1989. By December 1989, this amount had grown to over $9,700,000. Sometime in late October or early November 1989, Mark Cassin, a branch manager at Mid American, noticed that Stone had written a surprisingly large number of checks to OCB on his Mid American account. When Cassin contacted Stone and requested an explanation, Stone replied that his accountant had informed him the transfers were a necessary accounting procedure.

After Cassin discovered later that year that Stone's unusual checking activity continued unabated, he requested a meeting with Stone for January 9, 1990. At that meeting, Stone reiterated his reasons for the checking practices. Cassin responded that he did not feel comfortable with Stone's explanation and informed him that Mid American would close his accounts within ten days. Consequently, Mid American closed Stone's accounts on January 19, 1990. The check-kiting scheme thereupon collapsed. On that day, Stone went to OCB and admitted to bank officials that he had been kiting checks between the two banks. Following this meeting, Stone contacted Cassin at Mid American and told him also of his check-kiting scheme.

OCB was left with a final deficit of $465,962.67 as a result of Stone's kiting scheme. Stone stated that he had chosen OCB to absorb the loss because of OCB's service

---

1. Check kiting consists of drawing checks on an account in one bank and depositing them in an account in a second bank when neither account has sufficient funds to cover the amounts drawn. Just before the checks are returned for payment to the first bank, the kiter covers them by depositing checks drawn on the account in the second bank. Due to the delay created by the collection of funds by one bank from the other, known as the "float" time, an artificial balance is created.

charge for negative collected balances, with which Stone had been quite displeased.[2] The negative collected balance charge was a standard one generally imposed by OCB upon all business checking accounts. This charge was the prime rate plus two percent and equalled the rate OCB normally charged for loans of higher than average risk.

On August 16, 1990, Stone was charged in a one count information with bank fraud in violation of 18 U.S.C. § 1344. On November 14, 1990, the parties stipulated to an amended information. On January 8, 1991, the case was tried in the United States District Court for the Northern District of Ohio. At the conclusion of trial, the court found Stone guilty of bank fraud and subsequently sentenced Stone to two years imprisonment followed by three years of supervised release, plus restitution. This timely appeal followed.

## II

Stone's primary contention on appeal is that a bare check-kiting scheme does not constitute a "misrepresentation" within the meaning of 18 U.S.C.A. § 1344(2) (West Supp.1991) and, therefore, that his conviction under that section cannot stand. The current version of § 1344 reads as follows:

§ 1344. **Bank fraud**

Whoever knowingly executes, or attempts to execute, a scheme or artifice—

(1) to defraud a financial institution; or

(2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution,

by means of false or fraudulent pretenses, representations, or promises;

shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C.A. § 1344 (West Supp.1991).[3] The district court, sitting as trier of fact, found that Stone had knowingly executed a scheme or artifice to defraud a financial institution within the meaning of the statute and was therefore guilty of bank fraud.

■ Stone would have us shift the focus of our analysis onto subsection (2) of § 1344 and hold that an unadorned check-kiting scheme does not constitute "false or fraudulent pretenses, representations or promises" under that provision. Stone's interpretation of subsection (2) finds support in *Williams v. United States*, 458 U.S. 279, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982), where the Court interpreted 18 U.S.C. § 1014 (1988), which makes it a crime to "knowingly make[ ] any false statement or report" to certain enumerated financial institutions, to find that writing a check on insufficient funds does not constitute the making of a "false statement":

Although petitioner deposited several checks that were not supported by sufficient funds, that course of conduct did not involve the making of a "false statement," for a simple reason: technically speaking, a check is not a factual assertion at all, and therefore cannot be characterized as "true" or "false." ... Each check did not, in terms, make any representation as to the state of petitioner's bank balance.

*Id.* at 284–85, 102 S.Ct. at 3091.

In response to the Court's decision in *Williams*, Congress passed the more re-

---

**2.** A negative collected balance charge is imposed when a customer makes a deposit into his account and creates a debit on that account prior to the collection by the bank of his deposited checks.

**3.** The version of § 1344 in effect when Stone began his check-kiting scheme extended only to federally chartered or insured financial institutions and permitted a fine of not more than $10,000, or imprisonment of not more than five years, or both. 18 U.S.C. § 1344 (1988). On August 9, 1989, Congress amended § 1344 to extend to all financial institutions and increased the punishment allowable under the statute to a

fine of not more than $1,000,000 and a term of imprisonment not to exceed 20 years. *See* Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub.L. No. 101–73, § 961(k), 103 Stat. 183, 500 (1989). The most recent version of section § 1344, quoted in the text, was signed into law on November 29, 1990. Because the parties stipulated that OCB is federally insured, and because Stone was neither fined nor imprisoned in excess of the earlier section's limits, the differences between the various versions of § 1344 are immaterial to our analysis.

cent bank-fraud statute with the express intent of bringing check-kiting schemes within its reach:

In *Williams*, the Court concluded this form of fraud [check-kiting] did not fall within the scope of 18 U.S.C. 1014 because a check did not constitute a "statement" within the meaning of the statute.... These various gaps in existing statutes, as well as the lack of a unitary provision aimed directly at the problem of bank fraud, in the Committee's view create a plain need for enactment of the general bank fraud statute....

S.Rep. No. 225, 98th Cong., 1st Sess. 378 (1983), *reprinted in* 1984 U.S.Code Cong. & Admin.News 3182, 3518–19.

While this legislative language would appear to bring check-kiting, even absent false representations, within the purview of § 1344, at least two circuits have construed § 1344's legislative history narrowly and suggested that Congress effected its purpose by adding subsection (1), which prohibits a scheme or artifice "to defraud a financial institution," and that subsection (2) does not reach an unembellished scheme of check-kiting. Thus, in *United States v. Medeles*, 916 F.2d 195 (5th Cir.1990), where the defendant was charged and convicted only under § 1344(2), the court concluded that the bare check-kiting scheme alleged was insufficient to support the conviction. *Id.* at 201; *see also United States v. Bonnett*, 877 F.2d 1450, 1454–55 (10th Cir. 1989). The court in *Medeles* further concluded that, while Congress may have intended § 1344 *as a whole* to reach conduct such as check-kiting, there was no indication that § 1344(2) specifically was meant to do so. *Medeles*, 916 F.2d at 201. The court noted, however, that it might find a bare check-kiting scheme actionable under § 1344(1). *Id.*

Stone seeks further support in those cases interpreting similar language in the mail-fraud statute, 18 U.S.C.A. § 1341 (West Supp.1991), and the wire-fraud statute, 18 U.S.C.A. § 1343 (West Supp.1991).[4] For instance, in *United States v. Cronic*, 900 F.2d 1511, 1516 (10th Cir.1990), involving a conviction under § 1341, the court concluded that "a bare check kiting scheme, unembellished by other acts or communications, does not violate the false or fraudulent pretenses, representations, or promises clause of the mail fraud statute." *See also United States v. Rafsky*, 803 F.2d 105, 108 (3rd Cir.1986), *cert. denied*, 480 U.S. 931, 107 S.Ct. 1568, 94 L.Ed.2d 760 (1987).

Whether a bare check-kiting scheme remains insufficient to sustain a conviction under subsection (2), as Stone insists, is an issue we need not resolve in this case simply because the information under which Stone was convicted alleged that Stone had "devised a scheme or artifice *to defraud* the Ohio Citizens Bank." J.A. at 6 (emphasis added). This court has recently upheld a conviction for check kiting under the defraud provision of § 1344(1), *see United States v. Seago*, 930 F.2d 482, 486–87 (6th Cir.1991), thereby joining those circuits that have interpreted § 1344(1) to encompass check-kiting schemes within its strictures. *See, e.g., United States v. Celesia*, 945 F.2d 756, 758–59 (4th Cir.1991); *Cronic*, 900 F.2d at 1514; *United States v. Schwartz*, 899 F.2d 243, 246 (3d Cir.), *cert. denied*, ⸺ U.S. ⸺, 111 S.Ct. 259, 112 L.Ed.2d 217 (1990); *Bonnett*, 877 F.2d at 1455; *United States v. Taggatz*, 831 F.2d 1355, 1356–57 (7th Cir.1987). Similarly, a number of courts agree that a simple check-kiting scheme is actionable under the analogous "defraud" clauses of the mail-fraud statute, § 1341, and the wire fraud statute, § 1343, and, accordingly, have not required an affirmative misstatement to support a conviction. For example, *United States v. Street*, 529 F.2d 226, 229 (6th Cir.1976), we upheld a check kiting convic-

---

**4.** Although Stone cites *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), for the proposition that a conviction under § 1341 requires proof of a false representation as well as a scheme to defraud, we believe Stone misconstrues its holding. *McNally* merely held that both schemes to defraud and schemes relying on false representations must have as their end the deprivation of money or property, and not merely the deprivation of some intangible property right. *Id.* at 358, 107 S.Ct. at 2880; *accord United States v. Murphy*, 836 F.2d 248, 250 (6th Cir.), *cert. denied*, 488 U.S. 924, 109 S.Ct. 307, 102 L.Ed.2d 325 (1988).

tion under § 1341 absent any evidence of an affirmative misrepresentation. *Accord Rafsky*, 803 F.2d at 108 (holding that scheme to defraud under wire-fraud statute need not include evidence of misrepresentations); *United States v. Frankel*, 721 F.2d 917, 921 (3rd Cir.1983); *United States v. Halbert*, 640 F.2d 1000, 1007 (9th Cir. 1981). Stone offers no basis for rejecting this accepted interpretation.

We further note that even if Stone had been indicted and convicted solely under § 1344(2), sufficient evidence existed to support his conviction. The government offered uncontested testimony at trial that Stone misrepresented to Mark Cassin, the branch manager at Mid American, that his checking activities were a necessary consequence of his businesses' accounting procedures. While we consider this testimony sufficient to support Stone's conviction under § 1344(2), we hesitate to affirm Stone's conviction on that basis because the district court did not explicitly rely on this evidence in stating the factual grounds supporting Stone's conviction.

■ Anticipating our determination above, Stone maintains that the government violated his right to procedural due process by charging him with an additional offense in the amended information without providing adequate notice. The original information stated:

Beginning on or about June 1988 and continuing up to on or about January 19, 1990, the defendant, GENE E. STONE, devised a scheme or artifice to obtain monies, funds, or credits owned by or under the custody or control of the Ohio Citizens Bank by means of false or fraudulent pretenses, representations, or promises; to wit, defendant did obtain $518,451.67, by means of a "check-kiting" scheme in which false credit was obtained by the exchange and passing of worthless checks between the Ohio Citizens Bank and the Mid American Bank ... in violation of Title 18, United States Code, Section 1344.

J.A. at 5. By stipulation of both parties and pursuant to Federal Rule of Criminal Procedure 7(e), the information was amend-

ed to add the clause "to defraud the Ohio Citizens Bank and" immediately after the word "artifice." *Id.* at 6. The government's memorandum in support of the stipulation stated:

The amended language simply includes additional language from the bank fraud statute. Defendant is neither charged with an additional nor different offense. Further, defendant is in no way prejudiced by the amendment since the original information specifically described the scheme and artifice defendant devised— that is, the alleged check kiting scheme.

*Id.* at 8. The stipulation to amend was filed on November 9, 1990, nearly two months before trial.

Stone argues that he relied to his detriment upon the government's assurances that the amended information did not charge him with a different crime, and that he therefore believed that the prosecution would be forced to prove a misrepresentation as an element of the offense. Our review of the original and amended information, however, convinces us that Stone's argument is without merit. Federal Rule of Criminal Procedure 7(c)(1) requires that an "information shall be a plain, concise and definite written statement of the essential facts constituting the offense charged," as well as "the official or customary citation of the statute ... which the defendant is alleged therein to have violated." We find it significant that the amended information alleged no new facts. Moreover, both the original and the amended information charged Stone with violating § 1344 without qualification: neither information limited the charge to the first or second subsection of § 1344. The Supreme Court and this court have consistently held that even an erroneous statutory citation in an indictment does not thereby render the ensuing conviction under the correct statute invalid absent a showing of prejudice to the defendant. *See United States v. Groff*, 643 F.2d 396, 402 (6th Cir.), *cert. denied*, 454 U.S. 828, 102 S.Ct. 121, 70 L.Ed.2d 103 (1981); *United States v. West*, 562 F.2d 375, 379 (6th Cir.1977), *cert. denied*, 435 U.S. 922, 98 S.Ct. 1484, 55

L.Ed.2d 515 (1978); *United States v. Hutcheson*, 312 U.S. 219, 229, 61 S.Ct. 463, 464, 85 L.Ed. 788 (1941). If a complete miscitation in an indictment does not invalidate a defendant's conviction, it follows that the mere failure to include the language from a subsection of the correctly cited statute cannot be fatal.

In addition, Stone concedes on appeal that he stipulated to the amendment at least two months prior to trial, thus making his claim that the superceding information violated his *due process* rights particularly tenuous. While Stone seeks support in the Supreme Court's recent disposition in *Lankford v. Idaho*, —— U.S. ——, 111 S.Ct. 1723, 114 L.Ed.2d 173 (1991), we believe *Lankford* supports the government's position. In *Lankford,* the Court held that the government's failure to provide any notice whatsoever to the defendant prior to sentencing that he might face the death penalty violated his right to due process. *Id.* at 1732–33. The Court implied that, had defense counsel been given adequate notice, its due process concerns would have been satisfied. *Id.* at 1730–32. In the instant case, Stone was given notice of the information's amendment almost two months before trial began. This significant period of time, in conjunction with Stone's stipulation to the amendment, convinces us that the information's amendment did not prejudice Stone's substantial rights. *See* Fed. R.Crim.P. 7(e).

■ Stone next contends that the amended information, which alleged "a scheme or artifice to defraud ... *and* to obtain monies, funds, or credits ... by means of false or fraudulent pretenses," J.A. at 10 (emphasis added), charged him with violations of § 1344(1) and (2) in the conjunctive, and therefore that the elements of both sections had to be proven to support his conviction. Stone's contention, however, is contrary to the well-established rule of this circuit that an indictment may charge several acts in the conjunctive yet support a conviction of only one of the acts charged. *See, e.g., United States v. Hathaway*, 798 F.2d 902, 913 (6th Cir.1986); *United States v. Murph*, 707 F.2d 895, 896–97 (6th Cir.),

*cert. denied,* 464 U.S. 844, 104 S.Ct. 145, 78 L.Ed.2d 136 (1983). This rule has received the imprimatur of the Supreme Court as well. *See United States v. Miller,* 471 U.S. 130, 136, 105 S.Ct. 1811, 1815, 85 L.Ed.2d 99 (1985). We therefore find Stone's objection that the government did not prove the necessary elements under both subsections of § 1344 to be without merit.

■ As a final matter, Stone argues that the evidence presented at trial was insufficient to support the trier of fact's finding that his checking activities constituted a fraudulent scheme or that he had the requisite fraudulent intent. In reviewing challenges to the sufficiency of the evidence supporting a criminal conviction, we examine " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *United States v. Pearce*, 912 F.2d 159, 161 (6th Cir.1990) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)), *cert. denied,* —— U.S. ——, 111 S.Ct. 978, 112 L.Ed.2d 1063 (1991).

Stone rests this claim on his characterization of OCB's negative collected balance charge as a "loan" from the bank in the amount overdrawn. We find this characterization unpersuasive. Stone's elaborate check-kiting scheme was never authorized, negotiated, secured, or known to the bank. Stone offered no evidence suggesting that anyone at OCB considered the overdrawn checks a loan. Furthermore, if we were to adopt Stone's rationale, it would henceforth be perfectly legal for a person to kite checks at any financial institution that levied such a charge. This does not reflect the current state of the law, and Stone offers no compelling grounds why it should. A similar argument was squarely rejected in *United States v. McKinney*, 822 F.2d 946, 948–49 (10th Cir.1987), where the court noted:

> While simple overdrafts by themselves may not rise to the level of misapplication of bank funds, the evidence presented in this case showed a complicated

scheme wherein a series of worthless checks were systematically written, none of which had any monetary substance. [The bank] was unquestionably a victim of the scheme despite the fact that interest may have been paid on the uncollected funds.

OCB's assessment of a service charge did not in any sense confer a right upon Stone to engage in the otherwise illegal activity of check kiting. We therefore conclude that the evidence adduced at trial was sufficient to support Stone's conviction.

### III

For the foregoing reasons, we AFFIRM Stone's conviction in all respects.