**UNITED STATES of America, Appellee,**

v.

**Roger BURNETT, Defendant–Appellant.**

**No. 5, Docket 92–1167.**

United States Court of Appeals, Second Circuit.

Argued Oct. 18, 1993.

Decided Nov. 24, 1993.

Gretchen L. Wylegala, Asst. U.S. Atty., W.D.N.Y. (Patrick H. NeMoyer, U.S. Atty., W.D.N.Y.), for appellee.

Colleen P. Cassidy, New York City Legal Aid Soc., for defendant-appellant.

Before: MAHONEY and WALKER, Circuit Judges, and METZNER, District Judge.[1]

METZNER, Senior District Judge:

Appellant Roger Burnett appeals from a judgment entered in the United States District Court for the Western District of New York, after a general jury verdict convicting him of five counts of bank fraud under 18 U.S.C. § 1344. Burnett argues that the check-kiting scheme on which his convictions were based could not, as a matter of law, have violated subsection two of section 1344, which proscribes scheming to obtain money from a bank "by means of false or fraudulent pretenses, representations, or promises." As a result, Burnett claims that a new trial is required because, under a general verdict, the jury may have convicted him of violating only subsection two. *See Yates v. United States,* 354 U.S. 298, 312, 77 S.Ct. 1064, 1073, 1 L.Ed.2d 1356 (1957) (citations omitted).

We affirm the judgment.

## BACKGROUND

In January 1988, appellant Roger Burnett and two partners started a small trailer manufacturing business, Rotec Manufacturing, in upstate New York. Shortly thereafter, Burnett opened two checking accounts—one personal and one in Rotec's name—at the Alco Federal Credit Union.

In July 1988, a fire destroyed Rotec's plant and most of its equipment. Although Rotec resumed operations after the fire, its sales

---

**1.** Honorable Charles M. Metzner, Senior United States District Judge for the Southern District of New York, sitting by designation.

declined significantly. Burnett's partner Gary Miller testified that the business "just went downhill" after the fire.

Later that month, Burnett visited Arcade Hymatic, a manufacturer of barn cleaning equipment. Arcade's founder had died, and his widow, Effie Stefan, was managing the company. Arcade was profitable, with a strong customer base, and Burnett expressed interest in purchasing the company.

In August 1988, Burnett and Mrs. Stefan agreed that Burnett would purchase Arcade and some other assets for $250,000, payable in monthly installments of $1,200. At Burnett's suggestion, the agreement was not reduced to writing or finalized with an attorney.

Burnett took control of the business immediately. Mrs. Stefan transferred Arcade's books and records to Burnett, and Mrs. Stefan's son Donald signed hundreds of checks in blank to enable Burnett to use the Arcade checking account at Central Trust Company. The bank was not advised that Burnett was controlling the business, and did not learn of that fact until January, 1989. At the time Burnett was given access to the account, it had a positive balance. Bank officers testified that the Arcade account had been a "very good account" for 15 or 20 years.

Later that month, Burnett opened another personal checking account at the Cattaraugus County Bank.

In late September or early October 1988, Burnett began his check kiting scheme to cover Arcade's overdrawn account at Central Trust. By late fall 1988, the account was seriously overdrawn.

In general, check kiting occurs when a person knowingly deposits a worthless check which is immediately credited to the depositor's bank account. This increases the balance for a few days. In the meantime, typically, a check is drawn on the inflated balance and deposited in another account that is involved in the kiting scheme. This process is continued in a circular manner, usually among a number of accounts, to stave off the banks' recognition that there are insufficient funds to cover the checks.

In late 1988 Burnett, in order to cover the shortfall in the Central Trust account, began rotating checks on a daily basis in and out of his personal accounts at Alco and the Cattaraugus County Bank, the Rotec account at Alco, and the Arcade account at Central Trust. Burnett also instructed Gary Miller to write checks on Miller's personal Norstar Bank account "to add a fifth account to the rotation" because "he was afraid that the banks were going to catch on."

Over 125 checks, with a total face value exceeding half a million dollars, were written and deposited in the accounts before the scheme disintegrated. in 1989.

*Alco Federal Credit Union*

In January 1989, after checks deposited into Burnett's personal account and the Rotec account were returned for insufficient funds, Alco's manager notified Burnett that he had two weeks to straighten out the accounts, in accordance with bank policy. Before the two weeks had passed, the two accounts had accumulated a combined overdraft of over $53,000. The manager met with Burnett "on several occasions" regarding the overdraft. Burnett told her that he believed she had miscalculated the amount of the overdraft, and that her figures were "way off base." He explained that the problem was caused by "bad management" and the Rotec fire, and directed her to resubmit the unpaid checks, indicating that he intended to remedy the shortfall. The record does not indicate when Alco closed the accounts, but Alco's manager testified that Alco lost about $23,000 on the two accounts.

*Cattaraugus County Bank*

In January 1989, two employees of the Cattaraugus County Bank noted a pattern of bounced checks and suspected check kiting in Burnett's account. The bank began monitoring the account. When the manager advised Burnett of her suspicions, he told her that he intended to obtain a loan through the Alco credit union for a farm mortgage that would take care of any "inadvertent" shortfalls. At the time Burnett was telling this to Cattaraugus, he was directing Alco to resubmit the bounced checks, indicating that they would be paid. Burnett never applied for a loan at

Alco. In fact, Alco does not even issue farm mortgages.

On January 11, 1989, the Cattaraugus County Bank froze Burnett's account. As a result, checks payable to other accounts were dishonored. On January 24, the bank closed Burnett's account.

*Central Trust Company*

On January 1, 1989, the Arcade account at Central Trust was overdrawn by nearly $25,-000.

On January 23 or 24, the Cattaraugus County Bank called Central Trust and suggested that the Arcade account might be involved in check kiting. At that time Central Bank had a $10,000 overdraft, which increased to $35,000 by January 25. Burnett began meeting with Central Trust bank officers on a daily basis to avoid legal action against him. The account was closed around the end of February 1989, although the account was not overdrawn at that time.

*Norstar Bank*

On January 18, 1989, the Norstar bank manager noticed that two checks that Burnett had written and that Gary Miller had deposited into his personal account had been returned unpaid from other banks, and Miller's account was $2,600 overdrawn. After reviewing the activity in Miller's account, on January 18th, the branch manager informed Miller that his account would be frozen until the overdraft was paid. Burnett then assured the manager that a pending loan from Central Trust would "take care of everything." There is no evidence in the record that Burnett had applied for a loan from Central Trust. On January 20, 1989, two deposits brought the account into balance.

On July 8, 1991, Burnett was indicted on five counts of attempting "to defraud or obtain monies" from Central Trust and Alco Credit Union, in violation of 18 U.S.C. § 1344. On November 15, 1991, the jury returned a general verdict of guilty on all counts. For the reasons set forth below, we affirm.

**2.** The statute was amended in 1989 and the numbering of the subsections changed from § 1344(a)(1) and (2) to § 1344(1) and (2). Bur-

DISCUSSION

The Bank Fraud Statute provides that: Whoever knowingly executes, or attempts to execute, a scheme or artifice—

(1) *to defraud* a financial institution; or

(2) *to obtain* any of the moneys . . . under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations or promises;

shall be fined . . . or imprisoned . . . or both.

18 U.S.C. § 1344 (1988 & Supp. IV 1992) (emphasis added).[2]

The indictment in this case is inartfully drawn. Paragraph five of count one charges the defendant with having "devised a scheme or artifice to: (a) conceal the extent of the overdrawn balance at the Central Trust by orchestrating a series of rotating deposits of checks written on five different checking accounts, thereby defrauding the Central Trust. . . ." If the indictment had stopped at this point, we would have no problem, since the defendant was clearly guilty of violating section 1344(1), and he is not contesting the verdict in that regard.

However, paragraph five goes on to charge "and further, (b) *to defraud and obtain* monies of the ALCO Federal Credit Union, by depositing worthless checks written on the Arcade Hy–Matic account into the accounts at the ALCO Federal Credit Union." (Emphasis added.)

 This part of the allegation embraces both subdivisions one and two, omitting, however, subsection two's requirement that the scheme involve "false or fraudulent pretenses, representations or promises." Instead, the indictment charges the defendant with scheming to defraud the credit union "by depositing worthless checks." This language in the indictment has led to the appeal in this case because the presentation of overdrafts alone does not constitute a false statement to the bank. *Williams v. United States*, 458 U.S. 279, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982).

nett's conduct occurred under the unamended version of the statute.

The subsequent counts allege only that the defendant executed and attempted to execute a "scheme or artifice to *defraud* or to *obtain* monies" (emphasis added) as set forth in count one, each count alleging the kiting of a specified check.

The case was tried on the theory that the defendant was charged with violating both subdivisions of section 1344, and the defendant did not object to this procedure.

In *Williams v. United States,* 458 U.S. 279, 102 S.Ct. 3088, 73 L.Ed.2d 767 the Supreme Court considered whether the presentation of overdraft checks violated 18 U.S.C. § 1014, which prohibits making a "false statement" to a bank. In that case, the indictment had charged the defendant with depositing two overdraft checks on two separate occasions. The record reveals no allegation that the defendant had made any oral or written misrepresentations regarding his bank balance.

The Supreme Court held that the conduct did not violate section 1014, reasoning that "a check is not a factual assertion at all, and therefore cannot be characterized as 'true' or 'false,'" and observing that the checks themselves "did not, in terms, make any representation as to the state of petitioner's bank balance." *Id.* at 284–85, 102 S.Ct. at 3091–92.

In order to overcome the limiting effect of this holding by the Court, Congress passed the Bank Fraud Statute, 18 U.S.C. § 1344, in 1984.

Since the enactment of section 1344, the courts have held that a check-kiting scheme, regardless of its scale or complexity, constitutes a "scheme or artifice to defraud" a bank in violation of subsection one of Section 1344. *United States v. Stone,* 954 F.2d 1187, 1190 (6th Cir.1992); *United States v. Doherty,* 969 F.2d 425, 428–30 (7th Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 607, 121 L.Ed.2d 542 (1992); *United States v. Fontana,* 948 F.2d 796, 802 (1st Cir.1991); *United States v. Celesia,* 945 F.2d 756, 759 (4th Cir.1991); *United States v. Schwartz,* 899 F.2d 243, 247 (3d Cir.), *cert. denied,* 498 U.S. 901, 111 S.Ct. 259, 112 L.Ed.2d 217 (1990).

When considering subsection two of section 1344, however, several Circuit Courts have relied on the *Williams* reasoning and concluded that a plain check-kiting scheme, in which the only falsehoods or misrepresentations are the overdraft checks themselves, does not contain the requisite "false or fraudulent pretenses, representations, or promises." *See, e.g., Doherty,* 969 F.2d at 428; *United States v. Briggs,* 939 F.2d 222, 226 (5th Cir.1991), *cert. denied,* — U.S. —, 113 S.Ct. 1016, 122 L.Ed.2d 163 (1993); *United States v. Medeles,* 916 F.2d 195, 202 (5th Cir.1990); *United States v. Bonnett,* 877 F.2d 1450, 1456–57 (10th Cir.1989). As the court in *United States v. Cronic,* 900 F.2d 1511, 1516 (10th Cir.1990), held under the similar language of the Mail Fraud Statute, "a bare check kiting scheme, unembellished by other acts or communications, does not violate the false or fraudulent pretenses, representations, or promises clause...."

Several circuit court opinions have identified misrepresentations and deceptive practices that are sufficient to bring a check-kiting scheme within the parameters of section 1344(2). In *Bonnett,* 877 F.2d 1450, for example, the appellant conspired with two bank employees to execute an extensive check-kiting scheme. The Tenth Circuit upheld Bonnett's conviction under section 1344(2) based, not on the check-kiting itself, but on "the defendants' deceptive practices in their use of the worthless checks." *Id.* at 1453. In that case, the deceptive behavior was the "conduct of the conspirators in acting as if the checks were good and treating the checks in all respects as if they were drawn on collectable funds, with the knowledge that the ... checks were worthless." *Id.* at 1457.

The Eleventh Circuit reached a similar conclusion in *United States v. Falcone,* 934 F.2d 1528 (11th Cir.), *vacated,* 939 F.2d 1455 (1991), *reinstated in relevant part,* 960 F.2d 988 (en banc), *cert. denied,* — U.S. —, 113 S.Ct. 292, 121 L.Ed.2d 216 (1992).

Other examples of conduct, in addition to check kiting, on which circuit courts have relied to sustain convictions for violations of section 1344(2) include *United States v. Davis,* 989 F.2d 244, 247 (7th Cir.1993) (depositing of three forged money orders) and *United States v. Stone,* 954 F.2d at 1191

(false oral statements to bank manager about the state of defendant's bank account); *see also Briggs,* 939 F.2d at 227 (defendant's false representation that she was acting under her employer's authority) (dictum); *United States v. Sayan,* 968 F.2d 55, 61 n. 7 (D.C.Cir.1992) (false signatures and endorsements on checks and drafts would have supported conviction under subsection two had that statute been in effect when the conduct occurred).

Recognizing that the Second Circuit has not heretofore addressed this issue, we join our sister circuits and hold that while "bare" check-kiting schemes fall only under section 1344(1), "embellished" check-kiting schemes may be prosecuted under section 1344(2). In the case at bar, the evidence supports a jury finding that Burnett's scheme to defraud exceeded the claimed "unadorned" check-kiting of the *Williams* case.

Burnett concealed his control over the Arcade account from Central Trust by using checks signed by Donald Stefan and by having his employees make deposits into the account. He carefully coordinated deposits at Central Trust to conceal the number and amount of his daily deposits. He discussed the state of his account in person and over the telephone with the branch managers of each of the four banks involved, assuring them that the overdrafts were inadvertent and that any problems would be corrected. He suggested to the branch manager at the Cattaraugus Bank that an Alco farm mortgage would remedy the overdraft, when he had never applied for such a mortgage. He indicated to the manager at Norstar that a pending loan from Central Trust would bring his account into balance, when no evidence exists that he had applied for such a loan. While the scheme continued, he assured Mrs. Stefan that Arcade's finances were sound.

All of this conduct in connection with the check kiting comprised the scheme that sustains the finding of a violation of section 1344(2).

Affirmed.