**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Norman Anthony KING, Defendant–Appellant.**

No. 99–10054.

United States Court of Appeals,
Ninth Circuit.

Submitted Nov. 3, 1999[1]

Filed Dec. 22, 1999

---

1. The panel unanimously finds this case suitable for decision without oral argument. *See* Fed. R.App. P. 34(a)(2).

1208

Fred D. Gibson, III, Law Offices of Fred D. Gibson, III, Las Vegas, Nevada, for the defendant-appellant.

Margaret M. Stanish, Assistant United States Attorney, Las Vegas, Nevada, for plaintiff-appellee.

Before: CHOY, SCHROEDER, and ALARCON, Circuit Judges.

CHOY, Circuit Judge:

Norman Anthony King ("King") appeals his criminal conviction and sentencing following a jury trial in the District of Nevada. King was convicted of one count of bank fraud and three counts of wire fraud. The district court imposed a sentence of 51 months imprisonment, 5 years of supervised release, and $94,000 restitution. We have jurisdiction under 28 U.S.C. § 1291, and we affirm the conviction and sentence.

*Background*

### I. Introduction

The charges against King stem from a scheme to defraud the Bank of America ("BofA") through the negotiation of checks drawn on closed business accounts in a Canadian bank. After one of the worthless checks was credited to King's business account at BofA, he withdrew the proceeds by three separate wire transfers. On November 23, 1994, a federal grand jury returned a four count indictment against King, charging him with a single count of bank fraud in violation of 18 U.S.C. § 1344, and three counts of wire fraud in violation of 18 U.S.C. § 1343. The indictment was superseded to make non-substantive changes on July 8, 1998 and August 19, 1998.

The United States sought to extradite King, a Canadian citizen, from British Columbia, Canada. After King twice failed to appear at his extradition hearing, a provisional warrant was issued for his arrest. On or about March 10, 1997, King was arrested in Mexico. The United States commenced formal extradition proceedings to prosecute him in the instant case and in another case pending in the Northern District of California. The United States took custody of King on November 7, 1997 and transported him to the District of Nevada.

### II. TMC Target Marketing Corporation Check # 1048

In 1991, King opened three commercial accounts at Valley Bank of Nevada (taken over by BofA in 1992) under the following corporate names: (1) Target Marketing Corporation, doing business as Win A Fortune Contest; (2) McKinley, Richards & Wright Corporation, doing business as Trivia Quiz; and (3) Pan–American Marketing Corporation, doing business as Quick Cash Contest. King was the only authorized signatory on each of these accounts.

On or about April 19, 1994, BofA received a check in the amount of $47,000 for deposit in the Target Marketing Account. The check was drawn on an account held in the name of TMC Target Marketing Corporation at the Hongkong Bank of Canada. The check, # 1048, was dated April 13, 1993, and made payable to "Target Marketing Corp." The maker's signature was an illegible scribble. [This check is hereinafter called "TMC check # 1048."] Unbeknownst to BofA, the Hongkong Bank account upon which TMC check # 1048 was drawn had been closed since October 1992. King and his ex-wife, Cindy King, had been the signatories on that account.

Since TMC check # 1048 was drawn on a foreign account, BofA sent it to its foreign currency services in Los Angeles, California. The BofA office in Los Angeles noted that the check was stale-dated and returned it to Las Vegas. The Target Marketing account was then debited $47,015 (including a $15 foreign fee) on May 9, 1994. Before BofA discovered the stale date and debited the Target Marketing account, King withdrew the proceeds of the check.

### III. TMC Target Marketing Corporation Check # 1049

After TMC check # 1048 was returned as stale-dated, the Target Marketing account was about $48,868 overdrawn. After notifying King of the overdraft, BofA received a replacement check in the sum of $47,000 drawn on the same TMC account at the Hongkong Bank as TMC check # 1048. This check, # 1049, was also stale-dated April 13, 1993, and made pay-

able to "Target Marketing Corp." The memo section of the check read, "to replace check # 1048," and the maker's signature was an illegible scribble. [This check is hereinafter called "TMC check # 1049."]

## IV. The McKinley Hongkong Bank Checks

While BofA was still handling the overdraft created by the deposit of TMC check # 1048, three additional checks were presented for deposit in King's accounts at BofA. Each of these checks was drawn on McKinley, Richard & Wright Corporation's account at the Hongkong Bank in Canada. [These checks are hereinafter called "McKinley checks."] Like the TMC account at the Hongkong Bank, the McKinley account was closed. King had been the sole signatory of the McKinley account.

McKinley checks # 51 for $196,000 and # 52 for $47,000 were both payable to "Target Marketing Corporation." McKinley check # 53 for $196,000 was payable to "McKinley, Richards, & Wright Corporation." The payment information on each check was typewritten. Each check was dated April 29, 1994, and the maker's signature on each was an illegible scribble. The memo line on each check read, "transfer."

BofA decided to process these checks on a collection basis, rather than immediately credit King's accounts, because it was suspicious of the banking activity. Accordingly, BofA sent the checks to the Hongkong Bank in Canada for collection on or about May 3, 1994. On or about May 9, 1994, Hongkong Bank informed BofA that the McKinley account was closed and that the checks would be returned unpaid.

## V. The Barbados Check

Shortly before the deposit of TMC check # 1048, King issued a worthless check in the sum of $47,000 to pay for the shipment of prize notification postcards from Barbados to the United States. Nigel Cobham, a postal accountant with the Barbados

Postmaster, testified that King had contacted him to arrange the bulk mailing. Cobham further testified that when King requested the routing information for the Postmaster's bank, he expected that King was going to wire $47,000 to the Postmaster's bank as payment for this shipment of mail. On March 3, 1994, Cobham learned from the Postmaster's bank that it had received the $47,000. Cobham did not know that the $47,000 had been paid by check, not a money wire transfer. Believing that full payment had been received, Cobham ordered the shipment of 2,550 kilos of mail for King in March 1994.

After the mail had been shipped, the Federal Reserve Bank of New York notified the Central Bank of Barbados that the $47,000 check, drawn on the McKinley account at BofA, had been dishonored for non-sufficient funds.

### Discussion and Analysis of Law

## I. Duplicity Challenge

■ A duplicitous indictment compromises a defendant's Sixth Amendment right to know the charges against him, as well as his Fifth Amendment protection against double jeopardy. *United States v. Aguilar*, 756 F.2d 1418, 1420 n. 2 (9th Cir.1985) (citations omitted). Whether an indictment is duplicitous is a question of law reviewed de novo. *United States v. Martin*, 4 F.3d 757, 759 (9th Cir.1993). The court limits its review to a reading of the indictment itself to determine whether it may be read to charge a single violation. *Aguilar*, 756 F.2d at 1422.

■ King contends that Count One is duplicitous because it alleges at least two separate offenses. He identifies the deposit of TMC check # 1048 as one offense, the attempted deposit of the three McKinley checks as another, and the attempted deposit of TMC check # 1049 as a possible third. However, while these independent acts probably *could* constitute separate offenses, Count One alleges only a single

execution of the fraudulent scheme. Thus, the indictment is not duplicitous.

■ This court has not yet addressed a duplicity challenge in a bank fraud case. However, in multiplicity challenges under the bank fraud statute, we have held that each "execution" of a fraudulent scheme is punishable as a separate count. *See United States v. Poliak*, 823 F.2d 371, 372 (9th Cir.1987). In other words, the bank fraud statute "*allows* charging each execution of the scheme to defraud as a separate act." *Id.* (emphasis added). The question now before this court is whether an act which *can* be viewed as an independent execution of a scheme *must* be charged in a separate count.

The District of Columbia Circuit addressed this very question in *United States v. Bruce*, 89 F.3d 886, 889–90 (D.C.Cir.1996). In that case, the court rejected a duplicity challenge in a bank fraud prosecution, holding that an act which can be viewed as an independent execution of a fraudulent scheme need not be charged in a separate count. *Id.* at 889. In so holding, the court endorsed the Seventh Circuit's reasoning in *United States v. Hammen*, 977 F.2d 379 (7th Cir.1992):

> Each execution need not give rise to a charge in the indictment. The indictment in this case sets forth the existence of a scheme and alleges the scheme was executed on at least one occasion. The allegations tending to demonstrate the existence of the scheme do appear to be allegations that, if worded and structured differently, might constitute additional executions. This is hardly surprising; the actions that tend to prove the existence of the scheme will often be the actions actually taken to execute the scheme.

*Id.* at 383. We find this analysis sensible and persuasive, and we therefore hold that each execution of a scheme to defraud need not give rise to a charge in the indictment.

If the government is not required to charge every possible execution, the next question is whether King's indictment was written so as to allege only one execution of an ongoing scheme. *See Bruce*, 89 F.3d at 890. While the government specifies several acts in furtherance of the scheme, our review of the indictment persuades us that the government has carefully crafted the indictment to allege only one execution of the scheme. Thus, the indictment is not duplicitous.

## II. The Alleged Mistreatment of King By Mexican Officials and Inmates

King asserts that his indictment should be dismissed due to the abuse he allegedly endured while confined in Mexico. He argues that his mistreatment at the hands of Mexican officials and inmates amounted to a violation of due process. Alternatively, he contends that the district court should have dismissed his indictment under its supervisory powers.

### A. Due Process

■■ A district court may dismiss an indictment where the government's investigatory or prosecutorial conduct violates a defendant's due process rights. *United States v. Barrera–Moreno*, 951 F.2d 1089, 1091 (9th Cir.1991) (citations omitted). To violate due process, government conduct must be " 'so grossly shocking and so outrageous as to violate the universal sense of justice.' " *Id.* at 1092 (quoting *United States v. Restrepo*, 930 F.2d 705, 712 (9th Cir.1991)). "Due process is not violated unless the conduct is attributable to or directed by the government." *Id.*

■ In this case, King contends that the United States government violated his due process rights because he was arrested and confined in Mexico pursuant to a United States arrest warrant. However, absent an allegation and finding that the United States government perpetrated or directed the alleged abuse, King's motion must fail. Thus, the district court correctly denied his motion to dismiss the indictment on due process grounds.

### B. Supervisory Powers

■ If the government's investigatory or prosecutorial conduct is reprehensible, but not quite a violation of due process, the district court may nonetheless dismiss an indictment under its supervisory powers. *Barrera–Moreno,* 951 F.2d at 1092; *United States v. Owen,* 580 F.2d 365, 367 (9th Cir.1978). However, "these supervisory powers remain a harsh, ultimate sanction [which] are more often referred to than invoked." *Owen,* 580 F.2d at 367 (internal quotation marks omitted) (alteration in original).

■ As discussed above, the United States government did not direct or condone King's treatment in Mexico. In the absence of governmental misconduct, the district court did not abuse its discretion in declining to exercise its supervisory powers.

### III. Evidentiary Rulings

■ A district court's decision to admit or exclude evidence is reviewed for an abuse of discretion. *United States v. Castillo,* 181 F.3d 1129, 1134 (9th Cir. 1999). Whether proffered evidence constitutes evidence of acts beyond the scope of the indictment and admissible only in limited circumstances under Federal Rule of Evidence 404(b) is reviewed de novo. *United States v. Ramirez–Jiminez,* 967 F.2d 1321, 1327 (9th Cir.1992).

Rule 404(b) prohibits evidence of "other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity therewith." Fed. R.Evid. 404(b). The Rule does permit the admission of such evidence for the limited purpose of proving "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.* However, Rule 403 excludes relevant evidence otherwise admissible under 404(b) "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. . . ." Fed.R.Evid. 403.

Interpreting the Rules of Evidence in this area, this court has held that evidence of prior bad acts is admissible if: (1) there is sufficient evidence to allow the jury to conclude that the defendant committed the prior act; (2) the act was not too remote in time from the commission of the charged offense; (3) the act is similar to the charged offense; (4) the act is introduced to prove an element of the charged offense that is a material issue in the case; and (5) the act's probative value is not outweighed by its potential prejudice. *United States v. Miller,* 874 F.2d 1255, 1268 (9th Cir. 1989).

■ Proffered evidence falls outside the ambit of 404(b), and thus outside the above the analysis, when it is "inextricably intertwined" with evidence of the crime charged. *United States v. Soliman,* 813 F.2d 277, 279 (9th Cir.1987) (citation omitted).

### A. The Barbados Check

■ The district court did not abuse its discretion in admitting the Barbados transaction as 404(b) evidence probative of identity and lack of mistake. The test for admissibility set forth in *Miller* guides this inquiry.

The first two requirements are easily satisfied. First, there is clearly sufficient evidence to allow the jury to conclude that King posted the fraudulent check to the account of the Barbados Postmaster. Second, the Barbados events and the charged offenses were temporally proximate.

The third requirement for admissibility is also satisfied because King's fraudulent Barbados transaction is similar to his scheme to defraud BofA. In both situations, King sought to profit from delays in the international banking system. He withdrew money from BofA before the bank could discover that his checks were worthless; similarly, he contracted with the Barbados Postal Service to deliver his bulk mailing before it could discover that his check was dishonored. Thus, the Barbados transaction is similar enough to the charged offenses to be admissible.

The fourth requirement is also met. The Barbados transaction is evidence probative of King's identity and lack of mistake. Central to King's defense is his assertion that he did not personally issue the fraudulent checks to the Bank of America. Given the evidence that King himself issued the Barbados check, the scribbled signature on that check tends to prove that King also issued the fraudulent checks with similar scribbles to BofA. Moreover, King's use of the delays in the banking system to defraud the Barbados Postmaster tends to prove that an apparently similar strategy to defraud BofA was not merely a mistake.

Finally, the fifth requirement under the *Miller* test reflects the ever-present command of Rule 403. In light of the strong similarity and temporal proximity of the Barbados events to the charged offenses, the court below did not abuse its discretion in finding that the potential prejudice of this evidence did not substantially outweigh its probative value.

### B. King's Business Activity

■■■ The prosecution offered the testimony of Keith Salvato, a former acquaintance and business associate of King, to explain the general nature of King's business activity. The district court admitted this testimony as "circumstantial evidence [that] gives ... a context in which these transactions took place." Indeed, Salvato's testimony was not evidence of other crimes or acts outside the scope of the indictment. Rather, it was direct evidence, "inextricably intertwined" with evidence of the crime charged. *United States v. Soliman,* 813 F.2d 277, 279 (9th Cir.1987) (citation omitted). As such, it fell outside the scope of 404(b).

Rule 403 thus remained the only obstacle to the admission of this evidence. We cannot say that the district court abused its discretion in finding the evidence more probative than prejudicial.

### C. King's Flight to Mexico

■■■ The district court did not abuse its discretion by admitting evidence of King's flight to Mexico. In evaluating the probative value of flight evidence, this court has approved the test first set forth in *United States v. Myers,* 550 F.2d 1036 (5th Cir.1977). Under that test, flight evidence is probative of a defendant's guilt if four inferences are justified: "(1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged." *United States v. Silverman,* 861 F.2d 571, 581 (9th Cir.1988) (quoting *Myers,* 550 F.2d at 1049).

In this case, the first inference is justified because King fled to Mexico immediately prior to his scheduled extradition hearing. The second, third, and fourth inferences may be drawn from the fact that King was aware of the charges against him and the date of his extradition hearing when he fled to Mexico. *See United States v. Hernandez–Miranda,* 601 F.2d 1104, 1106–07 (9th Cir.1979) (noting that where a defendant is aware of the charges against him, his flight need not occur immediately after the commission of the charged crime to be admissible). In light of the circumstances surrounding King's flight, this evidence was not more prejudicial than probative. Accordingly, the district court did not abuse its discretion in allowing its introduction.

### IV. Sentencing

King asserts that the district court erred in its sentencing decisions by: (1) finding the Barbados events to be relevant conduct; (2) erroneously calculating the intended loss; and (3) failing to apply the three-level reduction for attempt. We disagree and affirm the district court's sentencing of King.

### A. Barbados Events

 The district court did not commit clear error in ruling that the Barbados events were "relevant conduct" under § 1B1.3(a)(2) of the Sentencing Guidelines. In assessing whether conduct is "relevant" within the meaning of that section, the sentencing court must consider the conduct's "similarity, regularity, and temporal proximity" to the charged offenses. *United States v. Hahn*, 960 F.2d 903, 910 (9th Cir.1992) (citations omitted). There is no precise ratio in which these components must exist in order to find conduct relevant. *Id.* However, "when one component is absent, ... courts must look for a stronger presence of at least one of the other components." *Id.*

In this case, the element of regularity is missing. However, given the strong similarity and temporal proximity of the Barbados events and the charged offenses, the district court did not commit clear error in finding the Barbados transaction "relevant conduct" under § 1B1.3(a)(2).

### B. Intended Loss Relating to McKinley Check # 0052

King contends that McKinley check # 0052 in the sum of $47,000 should be excluded from the intended loss calculation because it was intended simply to cover the overdraft in the BofA Target Marketing account.[2] If it were excluded, King correctly notes, the intended loss would be less than $500,000, and thus only nine levels (instead of ten) would be added to the base offense. *U.S. Sentencing Guidelines Manual* § 2F1.1(b)(1) (1998). However, the court below reasonably concluded that TMC check # 1049, and not McKinley Hongkong check # 0052, was meant to replace TMC check # 1048, and that King intended to withdraw the additional $47,000 fraudulently deposited with check # 0052. Thus, the district court did not

commit clear error in calculating the intended loss.

### C. Section 2X1.1

 Similarly, the district court did not commit clear error in denying King a three level reduction under § 2X1.1 of the Sentencing Guidelines. Section 2X1.1 provides a three level sentence reduction for defendants convicted of attempt, rather than completion of a substantive offense. *U.S. Sentencing Guidelines Manual* § 2X1.1(b)(1) (1998). King contends that he is entitled to the reduction because BofA never credited his account for the McKinley checks, and he was thus unable to obtain the money he "deposited." However, § 2X1.1 also clearly provides that the reduction is unavailable if the defendant completed all the acts he believed necessary to commit the substantive offense, or was about to do so when the completion was interrupted. *Id.*; *see also United States v. Blitz*, 151 F.3d 1002, 1011 (9th Cir.1998) (denying a reduction under Section 2X1.1(b)(1) where defendants "had done all of the acts that they believed were necessary to successfully complete their frauds on their victims").

In this case, King was about to complete all the acts he believed necessary to complete the fraudulent scheme when he was interrupted by BofA safeguards. Thus, the district court did not commit clear error in denying King a three level sentence reduction under § 2X1.1.

### V. Cross–Examination of King

 King argues that the district court abused its discretion by allowing the prosecutor to elicit King's refusals to answer questions on cross examination. The case law does not support King's position.

 Once a defendant testifies, he exposes himself to full cross-examination

---

**2.** Remarkably, defense counsel makes a completely contrary assertion in his Reply Brief. Arguing that Count One charged multiple executions, counsel states: "There is no evidence that the delivery of the McKinley checks was

intended to resolve the overdraft situation. To the contrary, evidence clearly identifies a second TMC check as an event directed to the overdraft status."

concerning matters relevant to his testimony. *Brown v. United States,* 356 U.S. 148, 155–57, 78 S.Ct. 622, 2 L.Ed.2d 589 (1958); *United States v. Panza,* 612 F.2d 432, 437 (9th Cir.1980), *cert. denied,* 447 U.S. 925, 100 S.Ct. 3019, 65 L.Ed.2d 1118 (1980). When a defendant refuses to answer questions on cross-examination, the district court may impose one or more of the following sanctions: (1) permit the prosecution to comment on the defendant's unprivileged refusal to answer; (2) permit the prosecution to impeach the defendant's direct testimony by continuing to elicit his unprivileged refusal to answer; (3) instruct the jury that it may take the defendant's refusal to answer various questions into account when reaching a verdict; and/or (4) strike the defendant's direct testimony. *Panza,* 612 F.2d at 437–38.

In this case, King refused to answer questions on cross examination because the district court did not allow him to read a letter describing the conditions of his confinement in Mexico to the jury. The district court informed King of the consequences of his refusal to take the stand for cross examination and ultimately imposed the second sanction noted above. The court's decision to impose this sanction was "guided by reason and fairness," *id.* at 439, and we hold that the district court did not abuse its discretion in allowing the prosecution to elicit King's unprivileged refusal to answer its questions.

## VI. Motion for Acquittal

■ King asserts two alternative grounds as the basis for his Rule 29(a) motion for acquittal. First, he argues that Count One of the indictment does not allege facts sufficient to support a conviction under the second prong of the bank fraud statute. Second, King argues that the evidence offered at trial was insufficient to sustain a conviction under § 1344(2).[3]

## A. Sufficiency of the Indictment

■ Fed.R.Crim.P. 7(c)(1) requires that an indictment be a "plain, concise and definite written statement of the essential facts constituting the offense charged." Moreover, an indictment "should be read in its entirety, construed according to common sense, and interpreted to include facts which are necessarily implied." *United States v. Givens,* 767 F.2d 574, 584 (9th Cir.1985) (citations omitted). Finally, error in the indictment shall not be ground for dismissal of the indictment or reversal of the conviction if the error "did not mislead the defendant to the defendant's prejudice." Fed.R.Crim.P. 7(c)(3).

■ Here, King correctly notes that the indictment does not specify the false representations supporting a claim under § 1344(2). However, the indictment does carefully allege the fraudulent transactions of which those false representations were a central part. Thus, while the indictment was not perfect, it was sufficient to inform King of the charges against him and to preclude future prosecution for the same offenses.

■ In any event, even if the government did err in drafting the indictment, reversal would still be inappropriate because the "error" did not mislead King to his prejudice under Rule 7(c)(3). *See United States v. Bonallo,* 858 F.2d 1427, 1431 (9th Cir.1988) (finding no prejudicial error under Rule 7(c)(3) where defendant was aware of the conduct at issue and was able to mount an adequate defense). King knew of the conduct of which he was accused, and he could (and did) adequately

---

3. King also contends that any evidence introduced at trial to prove his false representations constituted a material variance of the indictment. A material variance occurs when the charging terms of an indictment are left unaltered but the evidence offered at trial proves facts materially different from those alleged in the indictment. *United States v.*

*Von Stoll,* 726 F.2d 584, 586 (9th Cir.1984) (citation omitted). In this case, the evidence of King's false representations did not materially differ from the facts alleged in the indictment. Rather, the evidence at trial fleshed out and clarified those facts. Thus, King's variance argument fails.

prepare a defense. Indeed, his preparation would have been the same whether the indictment charged a violation of subsection (a)(1), subsection (a)(2), or, as was the case, simply § 1344. *See id.* Thus, even if the government erred in drafting its indictment, the error did not mislead King to his prejudice, and we must affirm. *See* Fed.R.Crim.P. 7(c)(3).

### B. Sufficiency of the § 1344(2) Evidence

King also asserts that the evidence offered at trial was insufficient to sustain a conviction under § 1344(2). The second prong of the bank fraud statute prohibits the execution or attempted execution of a scheme to defraud a financial institution "by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1344(2).

The deposit of an overdraft check is not a "false statement." *Williams v. United States,* 458 U.S. 279, 284–85, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982) (noting that "a check is not a factual assertion at all, and therefore cannot be characterized as 'true' or 'false' "). However, deceptive conduct connected to the use of worthless checks brings a defendant within the reach of § 1344(2). *See United States v. Burnett,* 10 F.3d 74, 79 (2d Cir.1993) (holding that defendant violated § 1344(2) where he embellished a check kiting scheme with false assurances to a bank that his overdrafts were mistakes and would be corrected); *United States v. Sayan,* 968 F.2d 55, 61 n. 7 (D.C.Cir.1992) (noting that false signatures and endorsements on checks and drafts would have supported conviction under § 1344(2) had that statute been in effect when the conduct occurred); *United States v. Bonnett,* 877 F.2d 1450, 1457 (10th Cir.1989) (holding that defendants violated § 1344(2) where they embellished the deposit of worthless checks by acting "as if the checks were good and treating [them] in all respects as if they were drawn on collectable funds").

In this case, King made several false representations. For example, after he obtained the proceeds of TMC check # 1048, he assured BofA personnel that the issuance of the check had been a mistake, and that he would cover the overdraft. In addition, when he learned that BofA had forwarded the worthless McKinley checks for collection, he told BofA personnel that he would certify new checks (an impossibility where the underlying account was closed) if the bank returned the worthless checks. Reviewing the evidence in the light most favorable to the government, it is clear that a rational juror could have convicted King under § 1344(2). Thus, the district court properly denied King's motion for acquittal.

### VII. Sufficiency of the Evidence

Finally, King contends that the evidence was insufficient to sustain his conviction. However, the record clearly indicates that a rational trier of facts could have found the essential elements of the charged offenses beyond a reasonable doubt. Thus, we reject King's challenge on this ground.

**AFFIRMED.**