**UNITED STATES of America, Appellee**

v.

**Floyd BRUCE, Appellant.**

**No. 95–3106.**

United States Court of Appeals, District of Columbia Circuit.

Argued May 9, 1996.

Decided July 26, 1996.

A.J. Kramer, Federal Public Defender, Washington, DC, argued the cause and filed the briefs for appellant, and Sandra G. Roland, Assistant Federal Public Defenders, entered appearances.

Mark J. Ehlers, Assistant United States Attorney, Washington, DC, argued the cause for appellee, with whom Eric H. Holder, Jr., United States Attorney, John R. Fisher, Thomas C. Black and Kristan L. Peters–Hamlin, Assistant United States Attorneys, were on the brief.

Before: WALD, SENTELLE and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

In February 1995, a jury convicted Floyd Bruce of two criminal counts stemming from his participation in a scheme to defraud Signet Bank. The defendant now raises two challenges to his conviction, claiming first that the bank fraud count in the indictment was duplicitous, and second, that his attorney labored under an actual conflict of interest which rendered his trial fundamentally unfair.

We reject both arguments. With respect to the defendant's first challenge, we find that Bruce's indictment correctly charged him with a single execution of a scheme to

defraud the bank and therefore was not duplicitous. With respect to the second charge, we find no conflict of interest even though we agree with the defendant that his attorney in one instance exercised poor judgment and possibly violated the rules of professional conduct. Nevertheless, we do not believe either that the attorney's improper action constituted a "conflict of interest," or, even if it could be so construed, that it adversely affected his representation of Bruce. We therefore affirm the convictions.

## I. BACKGROUND

The government charged Bruce with one count of bank fraud, in violation of 18 U.S.C. § 1344, alleging that he committed four separate fraudulent acts in furtherance of a single overall scheme to defraud Signet Bank. According to the indictment, Bruce carried out his scheme by way of four loan applications made over the course of a three-month period. Bruce made each application by telephone, through Signet's phone banking operation in Richmond, and scheduled the settlements at different Signet branch offices. The first three loans were scheduled to be settled in Maryland branch offices of the bank, but the fourth loan, which provides the act necessary to establish venue in the District of Columbia (D.C.) on the § 1344 count, was scheduled for settlement in D.C.

Testimony at trial established that Bruce, using false identification, took out a loan for $7500 in the name of George Brown. A discrepancy between the social security number on "Brown's" loan application and the number on the savings account card he filled out the day of the loan tipped off the bank manager that the loan might be fraudulent. Signet security officers launched an investigation that uncovered two other pending loan applications (also phoned into the telebanking center) which contained similar background information to the Brown loan. Because of the overwhelming similarities among the three applications, the bank concluded that they were fraudulent and that the same person or group might be responsible for all three of them.

Investigators set up a surveillance team at the Signet branch office on Reisterstown Road in Pikesville, Maryland, where one of the suspicious loans was scheduled for a September 1 settlement by a "Richard Lawson." But on that date, before showing up at the bank and presenting himself as Lawson, Bruce visited another Signet office in Pikesville and attempted to settle a loan there in the name of Michael Grand. The Grand loan had originally been scheduled for settlement on the following day, September 2. When the Signet employee processing the Grand loan on September 1 found a glitch in the application which required follow-up, Bruce became "antsy" and said he had an appointment at another bank. Shortly thereafter, Bruce was arrested at the original Pikesville branch for presenting false identification in the name of Richard Lawson and attempting to close the Lawson loan.

Following his arrest, investigators searched Bruce's car and found several forms of identification bearing his picture and the name Michael Grand, along with several other documents in the name of Floyd Bruce.

Two months later, a similar suspicious loan application was made to the telebanking center in Richmond, by a man identifying himself as "David Greene." Greene, whom witnesses at trial identified as speaking with an accent similar to the defendant's, provided Signet with some of the same phone numbers and employment information that had been used in the earlier fraudulent loans. Bank officials again became suspicious and set up surveillance at the Signet office in D.C. where the Greene loan was scheduled for settlement. On November 18, Bruce stood outside the bank while an accomplice, Victor Dede, entered the bank posing as David Greene. After Dede attempted to close the loan, both he and Bruce were arrested. Investigators found on Dede several forms of ID with Dede's picture and Greene's name, as well as a handwritten note with the name David Greene and the numbers and information included in the Greene loan application. On Bruce's person, investigators found an ID with Bruce's photo and the name "Cosmos Phillips," a ticket stub in Phillips' name, and a business card with credit card numbers and expiration dates on the back.

Shortly after his arrest, Bruce confessed to Secret Service Agents that he had been involved with a group of people who made false identification cards and that he had been approached by a friend about setting up fraudulent loans with Signet Bank. According to Bruce's statement, the friend asked him specifically if he wanted to do the David Greene loan in D.C., but Bruce claimed that he had declined and had explained to the friend that his prior arrest in Maryland made him "too hot" to do the D.C. loan. Victor Dede, who was also present during this conversation, apparently offered to do the Greene loan, and Bruce agreed to help him out by "school[ing]" him on it and driving him to D.C. on the scheduled day. Appellee's Brief at 14.

Bruce was indicted on, and convicted of, one charge of knowingly executing and attempting to execute a scheme and artifice to defraud Signet Bank (Count One), and one count of possessing a forged security (Count Two).

## II. DISCUSSION

### A. *The Duplicity Challenge*

■ The first count, which Bruce challenges as duplicitous, alleges one "scheme" to defraud Signet, and embraces the four separate loan applications each as one "part" of that overall scheme. Arguing that each application constituted a separate "scheme" and therefore had to be charged in an individual count, Bruce moved to dismiss the indictment. The district court denied the motion, finding that Bruce's activities evidenced a single scheme to defraud, "because the same victim was involved, the same bank, because the same methods were used...." Record Material Relied Upon By Appellee ("R.M.") A24.[1]

■ The bank fraud statute makes each "execution" of a fraudulent scheme punishable as a separate count. *See United States v. Pless*, 79 F.3d 1217, 1220 (D.C.Cir.1996) ("[T]he unit of prosecution is not the scheme but the execution. If appellant did not exe-

cute the scheme, he would not be guilty."). It is settled law that acts in furtherance of the scheme cannot be charged as separate counts unless they constitute separate executions of the scheme, *e.g., United States v. Lemons*, 941 F.2d 309, 318 (5th Cir.1991) (finding that the movement of one sum of money in several separate stages constituted only one "execution" and therefore could not support separate counts), and that acts which *do* constitute individual executions *may* be charged separately, *e.g., United States v. Poliak*, 823 F.2d 371, 372 (9th Cir.1987) (holding that § 1344 "unambiguously *allows* charging each execution of the scheme to defraud as a separate act") (emphasis added). What is less clear is whether the two situations are mutually exclusive; in other words, whether an act which *can* be viewed as an independent execution of a scheme *must* be charged in a separate count in order for the charge not to be duplicitous.

We think the sensible answer, and the one dictated by the most persuasive precedent, is that the two are *not* mutually exclusive; certain situations would justify indictment either in one count or in separate counts. Caselaw supports this conclusion. *See, e.g., Pless*, 79 F.3d at 1220 ("[I]t is not necessary for the government to charge every single act of execution of the scheme in order to prove the whole scheme."); *United States v. Longfellow*, 43 F.3d 318, 323 (7th Cir.1994) ("While for each count of conviction there must be an execution, each execution need not give rise to a charge in the indictment." (internal quotations omitted)). The Seventh Circuit, in *United States v. Hammen*, 977 F.2d 379 (7th Cir.1992), stated this proposition and explained the rationale justifying it:

> [E]ach execution need not give rise to a charge in the indictment. The indictment in this case sets forth the existence of a scheme and alleges the scheme was executed on at least one occasion. The allegations tending to demonstrate the existence of the scheme do appear to be allegations that, if worded and structured differently, might constitute additional executions.

---

1. In all cites to record material, the letter preceding the page number indicates the tab behind

which the information is located.

This is hardly surprising; the actions that tend to prove the existence of the scheme will often be the actions actually taken to execute the scheme.

*Id.* at 383.

Following *Hammen*'s lead, the question in this case is whether Bruce's indictment was written so as "to allege only one execution of an ongoing scheme." *Id.* Bruce's indictment charges him with having "knowingly executed and attempted to execute a scheme and artifice to defraud Signet Bank," and alleges that "it was part of the scheme to defraud" that he engaged in each act required for each of the loan transactions. In paragraph 16, however, the indictment alleges that "On or about November 18, 1994, within the District of Columbia, *for the purpose of executing and attempting to execute* the above-described scheme to defraud Signet Bank, N.A., the defendant, FLOYD BRUCE, and Victor Dede received cashier's check number 00140330 ... made payable to 'David Green' in the amount of $8,000.00." Appendix of Appellant ("A.A.") 13 (emphasis added). Thus, the prosecution "has carefully crafted the indictment to allege only one execution of an ongoing scheme that was executed numerous times." *Hammen,* 977 F.2d at 383.

In a case involving tax evasion rather than bank fraud, this court directly addressed the propriety of charging "in one count what could be several independent charges." *United States v. Shorter,* 809 F.2d 54, 58 n. 1 (D.C.Cir.1987). In such a case, according to *Shorter,*

> the Court must measure th[e] indictment against the purposes of the prohibition

against duplicity. These purposes include generally: (1) the prevention of double jeopardy, (2) an assurance of adequate notice to the defendant, (3) the provision of a basis for appropriate sentencing, and (4) the danger that a conviction was produced by a verdict that may not have been unanimous as to any one of the crimes charged.

*Id.; accord, United States v. Baytank, Inc.,* 934 F.2d 599, 609 (5th Cir.1991). The court concluded in *Shorter* that the defendant had been properly charged with one count of tax evasion over a twelve year period, since his actions could legitimately be regarded as a single course of conduct and the purposes of the bar against duplicity had been met. 809 F.2d at 58.

Similarly, in Bruce's case, the fraudulent loans could properly be viewed as parts of a single course of conduct and the purposes of the duplicity prohibition met. Because the specific acts in furtherance of the scheme are specified in the indictment, Bruce was on notice of the charge against him and need not worry about later being charged for the same acts. Moreover, the judge carefully instructed the jury that they must unanimously agree on the overall scheme and at least one of the specified acts in furtherance of the scheme (as well as the only act that occurred in D.C.), thereby eliminating the possibility of a nonunanimous verdict.[2]

### B. *The Conflict of Interest Challenge*

Next, Bruce claims that his attorney created an actual conflict of interest when, in the middle of trial, he divulged to the court in an *ex parte* hearing that Bruce had insisted that the attorney lie to the court on Bruce's behalf. We surmise from the trial transcripts

---

2. In the instructions to the jury, the district court explained: "The government must prove the scheme to defraud and it must prove that one or more acts in furtherance of the scheme to defraud were done by the defendant. And it must also prove beyond a reasonable doubt that one or more acts in furtherance of the scheme to defraud were committed by one or more participants in the scheme in the District of Columbia." A.A. D36–D37. (As noted in the government's brief, the only "act in furtherance of the scheme" that was alleged to have occurred in D.C. was the Greene transaction. The court can therefore conclude from the guilty verdict that the jury unanimously agreed that one of the participants

in the overall scheme executed the Greene loan. Brief at 30.) With respect to unanimity, the judge instructed the jury that "in order to return a guilty verdict on [count one], all jurors must unanimously agree as to at least one of [the specified] acts [in furtherance of the scheme]." R.M. I45.

During jury deliberations, the jury wrote a note to the judge asking the "significance of 'District of Columbia'" with respect to count one. In response, the judge reiterated that the jury must find that one or more acts in furtherance of the scheme to defraud must be found to have been performed by one or more participants in the scheme in the District of Columbia.

that Bruce was an uncooperative and manipulative client who put his attorney in a very difficult situation, but we conclude that the attorney exhibited an error in judgment when he decided to reveal his client's confidences to the court. Nevertheless, we reject Bruce's claim that the attorney labored under a conflict of interest that adversely affected the defense.

During the trial, Bruce decided that he was dissatisfied with the performance of his court-appointed attorney, Mr. Rudasill. Bruce demanded that Rudasill (who had been appointed to his case earlier in the proceedings when the defendant dismissed his *first* court-appointed attorney) seek leave to withdraw from his representation. A.A. A1. After a lengthy (and remarkably patient) discussion with the attorney and the defendant, the judge explained that he was not going to appoint another attorney to represent Bruce and that he was not going to delay the trial. In denying Bruce's request for new counsel, the district judge noted that the attorney was "a very competent lawyer ... who, in my judgment, is doing a good job." A.A. A15–A16; *see also* A.A. A26 ("I don't think that Mr. Rudasill has been ineffective. I think he has been quite effective."). The judge then went through each of the defendant's complaints regarding Rudasill's representation of Bruce and noted that most of Bruce's objections pertained to decisions the *court* had made rather than the lawyer. "[L]et me phrase it this way," the court told the defendant:

> On the pretrial motions, I can't think of a lawyer who would have done a better job than Mr. Rudasill in presenting the arguments in the duplicity of the indictment and the double jeopardy and the prosecution by two sovereigns. I thought it was a first rate motion.
>
> And he made all of the arguments that could have been made on your behalf. And he made it—and he made me read all of the cases that might have—that might have helped you on that score.
>
> I ruled against you. But it was not because you had an ineffective lawyer. And once I made that ruling, the evidence [you object to] came in.

A.A. A14. The court addressed each of the defendant's concerns in this fashion, explaining that the attorney had been fully effective, and then gave Bruce the option of proceeding *pro se* or continuing with Mr. Rudasill's representation. Bruce then announced that he wanted to be removed from the proceedings, apparently believing that the trial would have to be delayed if he were not present. The judge (again, very patiently) explained that Bruce had a right to be present, but that he could waive that right if he wished. A.A. A24–A38. If he remained in the courtroom, he would have to refrain from disrupting the proceedings, or the court would hold him in contempt; if he opted to have the marshals remove him from the courtroom, the trial would continue in his absence. The court then recessed for an hour and a half and instructed Bruce to discuss his options with counsel and advise the court after lunch which option he was electing.

The alleged conflict arose after the break, when the attorney announced to the court his belief that during the recess, "an irreconcilable difference ha[d] developed" between him and Bruce, and he requested an *ex parte* hearing. A.A. A39. According to Rudasill, Bruce had insisted during his lunchtime conference with his attorney that it was the attorney's responsibility "to do anything to pursue or advance" the client's interests. A.A. A43. Because Bruce believed his interests would be served by new counsel, he believed the attorney should do whatever was necessary to force the judge to alter his earlier decision not to remove Rudasill from the case. A.A. A43–A44. Apparently Bruce then demanded that Rudasill lie to the court "concerning the status of [the lawyer's] relationship with Mr. Bruce," A.A. A47, presumably by falsely informing the court that he was incapable for some reason of representing the defendant.

In his talk with Bruce, Rudasill explained that he "could not in good conscience" lie to the court, A.A. A43, and that he "could not compromise [his] own personal integrity to pursue [Bruce's] aims." A.A. A44. Nevertheless, Bruce continued to insist that it was a "requirement of his counsel," *id.*, to do as he requested. Rudasill informed the court

that he and his client had reached an impasse:

> I have refused to make those representations. I believe it is inconsistent with my ethical obligations to the Court and I will not do so. And my client's insistence that my failure to do so is somehow—is demonstrative of a lack of zeal in his representation is the basis of my request [to be removed from the case].

A.A. A46. The court then asked if Rudasill had discussed with Bruce whether the defendant wished to represent himself. A.A. A47. The attorney replied that Bruce had "indicated that he does not believe that at this point he's adequately prepared to represent himself." *Id.*

During this *ex parte* discussion, Bruce became angry and for a while refused to answer any questions posed to him by the attorney or the judge. Apparently Rudasill had not warned Bruce that he intended to inform on him to the judge, even though he *had* made it very clear to Bruce that he would not comply with the defendant's unethical request.[3] The court invited the prosecutor back into the room and addressed the issue in open court. Refusing to reward Bruce's manipulative effort to receive a third court-appointed attorney, the court once again explained Bruce's options to him: he could proceed *pro se*; he could continue with

---

Rudasill representing him (acting as co-counsel to Rudasill, if he wished); or he could let Rudasill represent him and choose to absent himself from the courtroom. A.A. A48.

At first, Bruce refused to respond to the judge. When he did speak, he issued the following monologue:

> THE DEFENDANT: Let the record show that they tried to entrap me. . . . I will not sit here calm in front of the jurors. I will not be convicted of nothing that I ain't done in D.C., nothing of it. I will not be tried for something I ain't done and let it show, please, I do not want no problems. I have maintained all day today everything is wrong. . . . Why should I be subjected to this? I shouldn't go through this. What did I do? I shouldn't go through this. Why do I have to be forced to go through this?

A.A. A55–A56.[4] Rudasill then jumped in and requested a competency examination for his client, to which the prosecutor responded that she believed the problem was belligerence rather than competency. A.A. A56. The court agreed with the prosecutor and announced his determination to proceed with the trial. The court again explained Bruce's options to him, and noted:

> [T]he Court has made a finding that Mr. Rudasill is competent and very profession-

---

3. RUDASILL: Mr. Bruce has been unresponsive to my attempts to communicate with him. And I have grave concerns that he has done what he said he would do, which is, you know, unless I pass this litmus test of allegiance to him, that essentially he would view me as not being his counsel and would not cooperate.

. . .

I am troubled. Not that in my experience I have not proceeded in trials where my client has even not been present in the courtroom; I have. It is something that I have experience with and I believe that I am capable of representing his interests if he so desires.

I think his interests obviously could be best protected if he had counsel with whom he was willing to communicate or had a belief in that counsel's good faith.

I can understand Mr. Bruce's hostility toward counsel. I did not tell him what I was going to do with his suggestion to me prior to relating it to the Court.

But as I stated to the Court, I have to exercise a degree of independent judgment with regard to where my ethical responsibilities lie. . . .

---

I believe it was my legal obligation and ethical obligation [to relate this to the Court].

THE COURT: Your ethical obligation is to zealously represent your client within the bounds of the law. That's what the rules say. And to be loyal to your client and his interests within the bounds of the law.
A.A. A50–A51.

4. The defendant appeared to believe that he should not be forced to stand trial at all:

All I'm saying is let me be, please. Let me be. I don't want no problems. I don't want no problems. When the jurors come in, I'm going to disrupt the court. . . . I have tried everything. I've—I've never seen a man so helpless in a court today in my life. I've never been through anything as such. I've never seen such wickedness in the hearts of mankind. . . . I can't keep sitting in here seeing my life go down before my own eyes. I'd rather be dead.
A.A. A61.

al in this matter and is representing your interests. It appears to the Court that all of this is an effort to delay these proceedings, to obstruct these proceedings and to abort these proceedings because you don't want to be on trial.

Well, you're on trial. You've been indicted by a grand jury.... And if you're not going to decide for yourself whether you want Mr. Rudasill to represent you or whether you want to represent yourself, I'm deciding for you.

A.A. A64.

The trial continued and Bruce made good on his threats to disrupt the proceedings. Because the defendant would not exercise his right to be removed from the courtroom, the judge ordered him shackled for part of the trial. *See* A.A. B7–B8. Eventually, however, the defendant settled down and the court observed that Bruce and Rudasill "seemed to the court to have reestablished a level of communication that has made it possible for them to consult with each other and to work together in presenting a defense." A.A. B11. The court also noted that Bruce had participated with Rudasill in the defense, and had asked constructive questions of witnesses. *Id.*

At the end of the trial, the jury returned guilty verdicts on both counts.

### 1. *The legal standard*

■ The government correctly classifies Bruce's "conflict of interest" challenge as a specific genre of "ineffective assistance of counsel" claims. Appellee's Brief at 31. Under usual circumstances, a successful "ineffective assistance" claim requires a defendant to show (1) that counsel's performance was deficient, falling "below an objective standard of reasonableness," and (2) that the deficient performance prejudiced the defendant, depriving him of a fair trial. *Strickland v. Washington*, 466 U.S. 668, 687, 688, 104 S.Ct. 2052, 2064, 2064–65, 80 L.Ed.2d 674 (1984).

The defendant in this case makes no effort to make the difficult *Strickland* showing of prejudice, arguing instead that this case fits into a subset of "ineffective assistance" cases which does not require the defendant to meet such a strict standard. In *Cuyler v. Sulli-*

*van*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), the Supreme Court explained that if a defendant can show that "a conflict of interest actually affected the adequacy of [the attorney's] representation[,] [the defendant] need not demonstrate prejudice in order to obtain relief." *Id.* at 349–50, 100 S.Ct. at 1719. Thus, if Bruce can show that "an actual conflict of interest adversely affected [Rudasill's] performance," the court will presume prejudice. *Strickland*, 466 U.S. at 692, 104 S.Ct. at 2067, *citing Cuyler*, 446 U.S. at 348, 100 S.Ct. at 1718.

### 2. *No actual conflict*

■ In two recent cases, we have rejected the defendants' attempts to force their ineffective assistance claims into the "actual conflict of interest" framework efforts and thereby supplant the strict *Strickland* standard with the far more lenient *Cuyler* test. *United States v. Leggett*, 81 F.3d 220, 227 (D.C.Cir.1996) ("[W]e are unpersuaded by Leggett's further attempt to style his disagreement with counsel over trial tactics as a[n actual] 'conflict of interest.'"); *United States v. Farley*, 72 F.3d 158, 166 (D.C.Cir. 1995) ("Farley attempts to repackage the ineffective assistance claim into an 'actual conflict of interest' claim.").

Several cases discussing *Cuyler* claims have required defendants claiming an actual conflict to show as a "threshold matter" that the defense attorney "was required to make a choice advancing his own interests to the detriment of his client's interest." *United States v. Litchfield*, 959 F.2d 1514, 1518 (10th Cir.1992) (internal quotations omitted); *United States v. Acevedo*, 891 F.2d 607, 610 (7th Cir.1989). It is the competition between these interests, rather than some independent failure of the attorney, that gives rise to the "conflict." Thus, not every shortcoming of counsel can be classified as a "conflict of interest." In this case, Bruce has failed to demonstrate that Rudasill ever advanced his own, or another client's, interests to the detriment of his client and we therefore reject his *Cuyler* claim.

■ In holding that Bruce has failed to show a conflict of interest, we in no way mean to indicate our approval of Mr. Ruda-

sill's decision to divulge his client's confidences to the court. In fact, our review of the American Bar Association's Model Rules of Professional Conduct suggests that the attorney might indeed have violated ethical standards in doing so. But a violation of an ethical obligation does not in itself give rise to a conflict of interest, unless it involves the attorney putting his own interests (or, of course, another client's interests) in conflict with his client's. *See, e.g., Acevedo,* 891 F.2d at 610 ("[The attorney's] alleged breach of ethics, however, does not automatically establish that [the defendant] was denied effective assistance of counsel.").

Chapter 1 of the Model Rules of Professional Conduct governs the "Client–Lawyer Relationship." Model Rules of Professional Conduct Rule 1.1–1.17 (1995). Rule 1.6, entitled "Confidentiality of Information" requires an attorney to guard a client's confidences under virtually all circumstances. The text of the rule reads as follows:

> (a) A lawyer shall not reveal information relating to representation of a client unless the client consents after consultation, except for disclosures that are impliedly authorized in order to carry out the representation, and except as stated in paragraph (b).

> (b) A lawyer may reveal such information to the extent the lawyer reasonably believes necessary:

> (1) to prevent the client from committing a criminal act that the lawyer believes is likely to result in imminent death or substantial bodily harm; or

> (2) to establish a claim or defense on behalf of the lawyer in a controversy between the lawyer and the client, to establish a defense to a criminal charge or civil claim against the lawyer based upon conduct in which the client was involved, or to respond to allegations in any proceeding concerning the lawyer's representation of the client.

MODEL RULES OF PROFESSIONAL CONDUCT RULE 1.6 (1995). In this case, neither of the exceptions listed in part (b) would excuse Rudasill's disclosure; Bruce had not threatened to maim or kill anybody, and no charges

had been brought against Rudasill which required the attorney to defend himself.

The next three rules in the Model Rules directly address "conflict of interest" situations, but, significantly, none of them mentions the kind of "conflict" created by an attorney's revelation of the client's suggestion that the lawyer commit an illegal act. Rather, the rules deal with more traditional conflicts of interest: representation of multiple parties, *id.* at Rule 1.7 cmt. [12]; representation of opposing parties, *id.* at cmt. [7]; a lawyer's implication in the same conduct as the client, *id.* at cmt. [6]; representation of a client with whom the attorney has business transactions, *id.* at Rule 1.8(a); representation by an attorney with pecuniary interests adverse to the client, *id.*; representation that would be adverse to a former client, *id.* at Rule 1.9.

The "conflict" between an attorney's duty to safeguard a client's confidentiality and her duty to be truthful to the court is addressed in a *different* section of the rules. Rule 3.3, entitled "Candor Toward the Tribunal," explains that an advocate's duty of candor to the court applies "even if compliance requires disclosure of information otherwise protected by Rule 1.6." *Id.* at Rule 3.3. This duty includes the obligation to avoid making a false statement to the tribunal, and to avoid assisting a criminal or fraudulent act by the client. *Id.* Thus, under the Model Rules, if disclosure of a client confidence is *necessary* to avoid assisting such an act, the attorney *must* disclose that fact, even if the disclosure would conflict with the lawyer's obligations under Rule 1.6. *Id.*

The D.C. Rules of Professional Conduct are even more protective of a client's privacy. Rule 3.3 of the local rules prohibits a lawyer from knowingly "offer[ing] evidence that the lawyer knows to be false," D.C. R. OF PROF. CONDUCT 3.3(a)(4), but contains an exception and a qualification that weaken the prohibition. In the case of a *criminal defendant* who intends to give false evidence, an attorney "shall first make a good-faith effort to dissuade the client from presenting the false evidence" and then, if the client refuses and the lawyer cannot withdraw, "the lawyer may put the client on the stand to testify in a

narrative fashion." *Id.* at 3.3(b). The last section of the rule contains the further qualification that

> [a] lawyer who receives information clearly establishing that a fraud has been perpetrated upon the tribunal shall promptly reveal the fraud to the tribunal *unless compliance with this duty would require disclosure of information otherwise protected by rule 1.6,* in which case the lawyer shall promptly call upon the client to rectify the fraud.

*Id.* at 3.3(d) (emphasis added).

Although we need not decide whether Rudasill violated the code of ethics, we think his conduct highly problematic. Even given the uncomfortable position in which Bruce left him, Rudasill most likely *could* have honored his obligations under both Rule 1.6 and Rule 3.3. When Bruce demanded that Rudasill lie to the court, Rudasill correctly advised his client that he would not honor the request. Bruce's persistence created a dilemma for Rudasill, but not one which required him to request an *ex parte* hearing.

The wiser course of action, we think, would have been for Rudasill to tell the judge, as he did, that he and his client had reached an impasse and that he would like to be removed from the case. In describing the "impasse," however, the lawyer should have avoided any mention of the fact that his client had asked him to lie to the court. The judge, having explained an hour before that he absolutely would not derail this trial, would likely have asked the defendant whether he agreed that he and his attorney had reached an impasse, and if so, whether he would rather proceed alone. The same result would have been reached, but without the disclosure of damaging information.

### 3. *No adverse effect*

Even under *Cuyler's* lenient actual conflict of interest standard, a defendant must show not only that the attorney faced a conflict, but also that the conflict "adversely affected his lawyer's performance." *Farley,* 72 F.3d at 166, *citing Strickland,* 466 U.S. at 692, 104 S.Ct. at 2067; *accord Leggett,* 81 F.3d at 227. As noted above, the trial judge in this case repeatedly complimented Rudasill's representation of Bruce. The court's factual finding that the representation was effective should govern this question unless shown to be clearly erroneous. Defendant has not begun to make that showing.

Most of the examples of ineffectiveness Bruce offers to demonstrate the adverse effect of the "conflict" on Rudasill's performance occurred *prior to* the *ex parte* hearing (and for that reason cannot be factored into the analysis of whether the conflict itself adversely affected the representation); the remaining examples simply lack merit. Specifically, Bruce challenges the following three alleged shortcomings of his attorney: (1) Rudasill's failure to object when the court informed Bruce that his prior conviction would be brought out at trial if he decided to testify;[5] (2) Rudasill's "invitation" for the court to exclude the only defense evidence available;[6] and (3) Rudasill's improper verbal

---

5. Significantly, there is no evidence in the record even remotely challenging the correctness of the court's warning regarding the admissibility of Bruce's prior conviction. Bruce's naked assertion that Rudasill should have attempted to keep the criminal history out of evidence, without an accompanying allegation that such a motion would have been legitimate, could not in any event meet his burden of showing that the alleged conflict had an adverse effect. For example, if the prior conviction were for a crime of dishonesty (such as, say, bank fraud), the Rules of Evidence would allow the information in, and a motion to the contrary would have been frivolous. FED R.EVID. 609(a)(2).

6. Rudasill proffered that his investigator had discovered that Victor Dede, Bruce's accomplice in this case, had attempted to take out a loan in the name of George Brown, in whose name Bruce had also taken out a fraudulent loan. A.A. C102. The potential benefit of this information would be to show that Dede had the ability to execute the scheme independent of any involvement by Bruce. *Id.* At the time Rudasill addressed the court, however, the defense witness was unavailable to testify, and Rudasill told the judge:

> I feel that it is my obligation if my client wants to testify, we may be able to put on a case and produce this additional evidence tomorrow. If he does not seek to testify, I can understand how the court might exclude it, given the lateness that it was brought to even counsel's attention.

A.A. C101. During the discussion regarding the proffer, Rudasill represented that he (Rudasill) had only known about the additional evidence for two days and therefore could not have ob-

exchange with one of the jurors.[7]

In response to these allegations, we simply note that the defendant has neither demonstrated, nor even suggested, a nexus between the alleged conflict and these examples of claimed ineffectiveness. If an attorney fails to make a legitimate argument *because* of the attorney's conflicting interest (for example, counsel fails to raise a misidentification defense because to do so might implicate himself or another client), then the *Cuyler* standard has been met. But if the attorney's alleged shortcoming is utterly unrelated to the conflict, the defendant cannot make use of the *Cuyler* presumption of prejudice and must instead proceed under *Strickland. See, e.g., Lopez v. Scully*, 58 F.3d 38, 42 (2d Cir.1995) ("We also believe that the second prong of the test for adverse effect—that trial counsel refrained from making an argu-

ment for leniency *because of the actual conflict of interest*—has been met." (emphasis added)).

In sum, we hold that the indictment in this case was sound, and that Bruce has failed to make out a successful ineffective assistance of counsel claim. Therefore, the defendant's convictions are

*Affirmed.*

---

tained it earlier. Bruce points out that, according to the trial transcripts, Rudasill had obtained a subpoena for the evidence six days previously. Bruce concludes that "Once again, defense counsel was in a conflict of interest situation, because by blaming the failure to obtain the material on defendant [because he failed to inform the attorney of its existence until mid-trial], counsel's interests were opposed to those of defendant." Brief of Appellant at 38.

Although Bruce attempts to paint a picture of a defense attorney who messed up and then unjustifiably pointed a finger at his client to explain the error, we do not necessarily find his picture convincing. First we note that Rudasill's claim that he had only known about the evidence for two days is not necessarily inconsistent with him having gotten the subpoena six days before; he wouldn't *know* that there was evidence to present until his investigator, armed with the subpoena, discovered the sought-after documents.

Next we note that the government argued that even if Bruce could prove that Dede had taken out another fraudulent loan, evidence of Dede's crime "would reinforce the argument that [Bruce and Dede] worked together as part of a team for a scheme." A.A. C103. In excluding the evidence (by refusing to delay the trial), the district court agreed with the prosecution and noted that the proffered evidence and testimony would likely be "more helpful to the government" than to the defense, as it would be "more probative of further evidence of a scheme between Bruce and Dede." A.A. C106. The court concluded: "I am not inclined to postpone the conclusion of the trial to await this evidence ... in light of the fact that on the basis of the proffer it seems to me that it's at least as helpful to the government, if not more so, this evidence, than it is to the defense." *Id.*

If it were necessary to decide whether Rudasill acted ineffectively in this instance, we could not conclude on the basis of this record that the attorney erred when he failed to push adamantly for the introduction of evidence that was likely to harm, rather than help, his client. Throughout the trial, Bruce had taken an active role in his defense and had insisted that Rudasill make motions that the attorney felt were ill-advised (for example, Bruce insisted that Rudasill object to a jury instruction which the attorney knew to state the law correctly: "I've tried to explain [the law] to him.... I don't know if he fully understands, but I'm making this objection because he asked." A.A. C89). Without more, we cannot conclude that Rudasill acted irresponsibly here.

7. Rudasill apparently mistook the juror for a law clerk, and spoke to her one morning as the two of them entered the courthouse. The juror classified the accidental exchange between her and the attorney as "just passing comments as we went in [to the courthouse]." A.A. B26. In an *ex parte* hearing, the court fully satisfied itself that the conversation would have no impact on the juror's impartiality, *id.*, but Bruce nevertheless claims that this episode "put [Rudasill] in a conflict of interest situation" where the attorney had "an interest in refuting the juror's testimony" in order to "minimize counsel's misconduct." Appellant's Brief at 37. Significantly, however, the court expressly found that Rudasill's version of the exchange that took place was *not* inconsistent with the juror's version. A.A. B28–B29 ("[I]n terms of what was said, I think that the court can credit both what [the juror] said and what Mr. Rudasill has said."). If the versions were consistent, Rudasill could not have been in a position where he needed to "refute" the juror's testimony.