United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued January 16, 1998 Decided March 10, 1998

 Released April 7, 1998

 No. 97-3053

 United States of America, 

 Appellee 

 v.

 Anthony J. Gantt, a/k/a Fats, 

 Appellant 

 Appeal from the United States District Court 

 for the District of Columbia 

 (No. 96cr00317-02)

 William B. Moffitt argued the cause and filed the briefs for 
appellant.

 John L. Brownlee, Assistant U.S. Attorney, argued the 
cause for appellee, with whom Mary Lou Leary, U.S. Attor-
ney at the time the brief was filed, John R. Fisher, Thomas 
C. Black and William J. O'Malley, Assistant U.S. Attorneys, 
were on the brief.


 Before: Edwards, Chief Judge, Wald and Rogers, Circuit 
Judges.

 Opinion for the Court filed by Chief Judge Edwards.

 Edwards, Chief Judge: In February 1997, a jury convicted 
Anthony J. Gantt ("appellant" or "defendant") of two criminal 
counts related to the possession and distribution of cocaine. 
Gantt's representation prior to and during trial was marked 
by confusion. In the weeks leading up to the trial, he grew 
dissatisfied with the performance of his attorney, (hereinafter 
"Attorney X"), and Attorney X withdrew from the case in 
favor of another attorney. It was then discovered that 
Attorney X, during the time he represented Gantt, simulta-
neously represented another man (hereinafter "John Doe") 
who--apparently without Attorney X's knowledge--had been 
questioned by prosecutors in connection with Gantt's case. 
Meanwhile, Gantt's new attorney moved to continue the trial 
for 30 days, because he needed to rethink his trial strategy 
after learning that Gantt had made incriminating statements 
during a "debriefing" session with the Government earlier in 
the proceedings. The District Court granted a two-day con-
tinuance.

 Gantt now raises three challenges to his conviction, claim-
ing that: (1) Attorney X rendered ineffective assistance be-
cause of a conflict of interest; (2) the District Court erred in 
refusing the 30-day continuance; and, (3) the District Court 
erred by allowing the jury to see, during deliberations, only 
two one-hour videotapes that had been shown during trial, 
rather than the full 72 hours of videotapes that were submit-
ted into evidence. Although the handling of this case by 
counsel left something to be desired, we can discern no 
reversible error by the District Court. Accordingly, appel-
lant's conviction is affirmed.

 I. Background

 A.The Offense

 The offense leading to the trial in this case occurred on 
February 1, 1995. The evidence offered by the Government 


to prove the offense was largely uncontested, because appel-
lant presented no testimony at trial. The facts were as 
follows.

 On February 1, 1995, Gantt and another man, Olden Min-
nick, drove to a retail store located in the Northwest section 
of the District of Columbia. At the time, the store was 
subject to extensive electronic and physical surveillance by 
agents of the Drug Enforcement Administration ("DEA 
agents"). After Gantt and Minnick parked and entered the 
store, a DEA agent established that the car in which Minnick 
and Gantt arrived was registered to Minnick. Gantt and 
Minnick eventually emerged from the store, with Gantt carry-
ing a white plastic bag. The two got in the car and drove 
away, with Minnick at the wheel. DEA agents followed and 
called for additional help.

 The car carrying Minnick and Gantt stopped at a traffic 
light near 16th Street and Columbia Road, and officers from 
the Metropolitan Police Department quickly pulled in front of 
and behind the car. An officer who approached the passen-
ger side of the car saw Gantt sit upright and stare straight 
ahead. When the officer shined his flashlight on Gantt and 
tapped the window, Gantt did not respond. Another officer 
approached the driver's side of the car. Both officers then 
heard the automatic door locks "click" down. After apparent 
communication between Minnick and Gantt, the car drove 
over a concrete island and sped away. During the ensuing 
chase by the police, Minnick threw a bag containing several 
blocks of cocaine out of the driver's side window. Minnick 
and Gantt succeeded in evading the police. The police did not 
arrest Gantt until November 5, 1996, at which time he was 
charged with conspiracy to distribute more than 500 grams of 
cocaine in violation of 21 U.S.C. s 846, and possession with 
the intent to distribute more than 500 grams of cocaine in 
violation of 21 U.S.C. ss 841(a)(1) and 841(b)(1)(B)(ii).

 B.Pre-Trial Proceedings

 The facts pertaining to the pre-trial proceedings implicat-
ing Gantt were not in dispute before the District Court, see 
Hearing Tr. (4/25/97) at 56-57 (adopting chronology of events 


set forth in Government's Opposition To Defendant's Motion 
For a New Trial, Crim. No. 96-317-02(JR) (filed Apr. 24, 
1997) ("Government's April 1997 Motion")), and for the most 
part are not in dispute on appeal. The undisputed record 
shows that John Doe, who was represented by Attorney X, 
was questioned by prosecutors about the Gantt case in the 
spring or summer of 1996. Subsequently, Doe signed a plea 
agreement in connection with charges then pending against 
him; he was then called to testify before a grand jury. 
Attorney X was unaware that Doe had been questioned by 
prosecutors about the Gantt matter.

 Following an indictment filed on September 17, 1996, police 
officers arrested Gantt on November 5, 1996. At Gantt's 
presentment, a colleague of Attorney X appeared on behalf of 
the defendant, stating that he was standing in for Attorney X. 
Assistant United States Attorney ("AUSA") Richard Ed-
wards, who had been handling the investigation of the events 
that took place on February 1, 1995 (hereinafter "February 
1995 incident"), attended the presentment. However, Ed-
wards failed to recognize--as did apparently every other 
AUSA who had contact with Doe and Gantt--that a potential 
conflict of interest resulted from Attorney X's simultaneous 
representation of Doe and Gantt.

 The parties provide conflicting accounts as to when Attor-
ney X entered his first formal appearance on behalf of Gantt. 
According to Gantt, Attorney X appeared at a status confer-
ence on November 25, 1996, at which trial was set for 
February 3, 1997. See Appellant's Br. at 7. According to the 
Government, Attorney X first appeared at a status conference 
on January 3, 1997, at which the February trial date was 
confirmed. See Government Br. at 9; Government's April 
1997 Motion, at 5. Attorney X claims that he saw Gantt at 
the D.C. Jail during the week of November 16-22, 1996, "to 
finalize representation arrangements as well as to advise 
defendant of the best legal course of action to take." 
Ex Parte Motion for CJA Appointment, Crim. No. 
96-317-02(JRR) (filed Jan. 22, 1997), at 2. Following his 
discussions with Gantt, Attorney X says that he arranged for 


defendant to be debriefed and had a second colleague accom-
pany Gantt to the debriefing. See id.

 In any event, the parties apparently agree that the second 
colleague of Attorney X represented Gantt at a status hearing 
on November 15, 1996. Around that time, the second col-
league told AUSA Edwards that Gantt was interested in 
pleading guilty in the case and cooperating with the Govern-
ment. Subsequently, on November 27, 1996, the second 
colleague and Gantt attended a Government debriefing, 
where Gantt, after signing a letter stating that his remarks 
could be introduced at trial for cross-examination purposes, 
discussed the February 1995 incident and spoke of other drug 
dealers in the area and of the assistance he could provide. 
AUSA Edwards was not present at the November 27 debrief-
ing.

 With the second colleague still representing Gantt, the 
parties reached a tentative arrangement to enter into a plea 
agreement. However, at the request of Attorney X, AUSA 
Edwards did not seek actual entry of the plea until after 
January 1, 1997. The court released Gantt on personal 
recognizance on December 11.

 As it turned out, Gantt never entered a guilty plea. During 
the three weeks after the January 3, 1997, status conference, 
Gantt, by his own account, "became dissatisfied" with Attor-
ney X and sought the services of another lawyer, Antoini 
Jones. Appellant's Br. at 3, 8. During the week of January 
12, 1997, Attorney X informed AUSA Edwards that he was 
going to withdraw from the case in favor of Jones. On 
January 22, 1991, Attorney X moved to withdraw as Gantt's 
counsel "based upon irreconcilable differences," stating that 
defendant had "refused counsel's advice concerning a plea 
offer made by the government." Motion to Withdraw as 
Counsel of Record, Crim. No. 96-317-02(JRR) ("Motion to 
Withdraw"). At a hearing held the same day, Jones entered 
an appearance on behalf of Gantt and informed the court that 
he was replacing Attorney X. At that hearing, Jones in-
formed the court that he would be ready for trial on Febru-
ary 3, 1997. See Hearing Tr. (1/31/97) at 2.


 On January 27, 1997, Attorney X sent a letter to AUSA 
Edwards stating that he had just learned of Doe's involve-
ment in the case. Attorney X stated that no one from the 
United States Attorney's Office had told him that Doe had 
been questioned in connection with Gantt's case, and that he 
had just learned of it a few days earlier when Doe himself 
told him for the first time. Attorney X further stated that he 
had never been present during any debriefing of Doe where 
Gantt was discussed, nor did he know that Doe had been 
called to testify before a grand jury. Attorney X asserted 
that he was unaware of the conflict issue at the time he was 
advising Gantt concerning the plea offer and trial options.

 On January 31, 1996, Jones moved for a 30-day continu-
ance because he had just learned of Gantt's debriefing by the 
Government on November 27, 1996. Jones claimed that he 
would now have to "regroup and come up with another trial 
strategy." Hearing Tr. (1/31/97) at 5-6. The District Court, 
noting that moving back the trial date would cause substantial 
scheduling problems, granted Gantt a two-day continuance. 
See id. at 13-14.

 C.Trial and Post-Trial Proceedings

 On February 5, 1997, a jury trial commenced. The Govern-
ment's evidence included four video tapes from surveillance of 
the store involved in the February 1995 incident; testimony 
from DEA agents and from police officers who stopped and 
approached the car allegedly carrying Minnick and Gantt 
before it sped away; and fingerprint evidence gathered from 
the wrapping of the package that was thrown from the car 
during the chase. During the course of the trial, after an 
evidentiary hearing, the trial judge denied Gantt's motion in 
limine asking the Court to exclude for impeachment purposes 
all statements by Gantt during his debriefing. Gantt then 
decided not to testify. Gantt's attorney waived opening state-
ment and offered no evidence on behalf of Gantt. The jury 
convicted Gantt on February 7, 1997.

 Gantt moved for a new trial, contending, inter alia, that 
Attorney X's simultaneous representation of Doe and Gantt 
before Jones took over Gantt's case violated the latter's right 


to a fair trial. On April 25, 1997, the District Court denied 
Gantt's motion for a new trial and sentenced him to a prison 
term of 135 months, an eight year period of supervised 
release, and a one hundred dollar special assessment. This 
appeal followed.

 II. Analysis

 A.The Conflict of Interest Challenge

 Gantt argues on appeal, as he did to the District Court in 
his motion for a new trial, that he received ineffective assis-
tance of counsel in violation of the Sixth Amendment as a 
result of Attorney X's simultaneous representation of both 
Doe and appellant. Because Doe was questioned by prose-
cutors about the Gantt case, appellant argues that Attorney 
X had a conflict of interest that caused him to be ineffective 
in rendering pre-trial advice to Gantt. Appellant's counsel 
observes in this regard that, "[d]uring this time period, [At-
torney X] arranged to have Mr. Gantt waive his Fifth 
Amendment rights, make self-incriminating statements, and 
attempted to convince Mr. Gantt to plead guilty." Appel-
lant's Br. at 24.

 A criminal defendant succeeds on an ineffective assistance 
of counsel claim under the Sixth Amendment if he shows that 
"an actual conflict of interest adversely affected his lawyer's 
performance." Cuyler v. Sullivan, 446 U.S. 335, 348 (1980). 
A defense attorney has an "actual conflict" when he is "re-
quired to make a choice advancing [another client's] interests 
to the detriment of his client's interest." United States v. 
Bruce, 89 F.3d 886, 893 (D.C. Cir. 1996) (internal quotation 
omitted); see also United States v. Thomas, 114 F.3d 228, 252 
(D.C. Cir.), cert. denied, 113 S. Ct. 635 (1997). By making the 
required showing under Cuyler, a defendant avoids the more 
stringent two-part test for ineffective assistance set forth in 
Strickland v. Washington, 466 U.S. 668 (1984), which requires 
proof "(1) that counsel's performance was deficient, falling 
'below an objective standard of reasonableness,' and (2) that 
the deficient performance prejudiced the defendant, depriving 
him of a fair trial." Bruce, 89 F.3d at 893 (quoting Strick-


land, 466 U.S. at 687, 688). Where a defendant meets the 
Cuyler test, prejudice is presumed. See Strickland, 466 U.S. 
at 692; Thomas, 114 F.3d at 252.

 Gantt cannot succeed under Cuyler for the simple reason 
that Attorney X, during his representation of appellant, did 
not know that prosecutors had questioned Doe about the 
Gantt case. In other words, no "actual conflict" existed. The 
chronology of pre-trial proceedings provided by the Govern-
ment, and relied upon by the District Court without challenge 
from appellant, see Hearing Tr. (4/25/97) at 56-57, shows that 
Attorney X never knowingly chose between advancing Doe's 
interests and advancing those of Gantt. It was only after 
Attorney X ceased his representation of Gantt that Doe 
informed Attorney X that he had been questioned about 
Gantt's case. Government's counsel--most notably AUSA 
Edwards--failed to make the connection that Attorney X 
represented both Doe and Gantt until Attorney X wrote to 
him with that information. Thus, even if Attorney X advised 
Gantt to be debriefed by the Government or plead guilty, he 
did so without knowing of any possible connection between 
Gantt and Doe. Under these circumstances, Attorney X did 
not face an "actual conflict," so he did not render ineffective 
assistance on that ground. See United States v. Hopkins, 43 
F.3d at 1116, 1117 (6th Cir. 1995) ("A conflict is hypothetical 
where, as here, the attorney does not in fact know of the 
conflict from the dual representation.").

 Furthermore, on the record at hand, Gantt cannot show 
that any alleged conflict "adversely affected" Attorney X's 
performance. That element of the Cuyler test requires Gantt 
to demonstrate that the conflict had "some negative effect 
upon his defense (defined as 'an actual lapse in representa-
tion')." United States v. Shark, 51 F.3d 1072, 1076 (D.C. Cir. 
1995) (quoting Cuyler, 446 U.S. at 349-50). Here, appellant 
makes no serious argument that Attorney X (or any other 
attorneys in his place) would have acted differently on Gantt's 
behalf had he (or they) known about Doe's involvement at an 
earlier stage in the proceedings. In other words, appellant 
fails to articulate a strategy that would have been employed 


by a defense counsel upon learning of Doe's involvement that 
was not followed in this case.

 Gantt contends that, "had Mr. [Attorney X] promptly noti-
fied the district court of his conflict, the district court would 
have had no choice but to remove him as Mr. Gantt's counsel 
due to the conflict." Appellant's Br. at 29. Appellant does 
not make clear the implications of this hypothesis. Surely, 
the mere fact that another attorney would have taken over 
the case does not demonstrate that Attorney X was deficient 
in representing Gantt. We might take appellant to mean that 
another attorney in place of Attorney X would have advised 
Gantt to forgo the debriefings with the Government. Howev-
er, we are at a loss to understand why this would have been 
viewed as a good strategy. Presumably, if Gantt had de-
clined to meet with the Government in November 1996, he 
would have been free to testify on his own behalf without fear 
of impeachment from the debriefing materials. However, it 
is uncontested that the Government's affirmative case against 
Gantt, based upon testimony of officers, fingerprint evidence, 
and videotapes of the store, would have remained formidable. 
Indeed, Gantt suggests nothing that he or other witnesses 
might have said to refute or diminish the prosecution's case.

 Moreover, during the hearing held on April 25, 1997, on 
defendant's motion for a new trial, the District Court found it 
"very clear" from testimony provided by Attorney X that, 
before Gantt's debriefing, the defendant was primarily con-
cerned with obtaining his release from detention prior to the 
Christmas holiday and with avoiding incarceration for the 
charged offenses. Hearing Tr. (4/25/97) at 53-54. Thus, it is 
unsurprising that Gantt, even in hindsight, fails to articulate a 
reason why Attorney X's advice that he cooperate with the 
Government would have been unsound, even if the fact of 
Doe's conversations with the Government had been known to 
Attorney X or another attorney in his stead. Assuming, 
arguendo, that another attorney might have advised Gantt 
differently, the mere possibility that appellant would have 
refused a debriefing in these hypothetical circumstances does 
not, by itself, demonstrate that there was a "lapse of repre-
sentation" in the instant case.


 To further support his contention that Gantt suffered ad-
verse effects from Attorney X's conflict, Gantt argues that 
Attorney X's actions in Gantt's case were "strongly, if not 
solely, motivated by his ability to collect a fee.... [A]s far 
as his ability to earn a fee, the most expedient course of 
action for [Attorney X] was exactly what took place in the 
instant case--allow the conflict to remain undisclosed and 
advise Mr. Gantt to enter into a plea agreement so that there 
will be no trial." Appellant's Br. at 29. This allegation is 
either (1) an implicit assertion that Attorney X actually knew 
of the conflict, which he failed to disclose so that he could 
increase his fee, or (2) an alternative theory of an "actual 
conflict"--i.e., that Attorney X was forced to choose between 
advancing his own pecuniary interests and mounting an effec-
tive defense on behalf of Gantt. Neither claim demonstrates 
an actual lapse in representation, because neither explains 
why Gantt should not have agreed to the debriefing.

 Furthermore, Gantt did not argue to the District Court, 
nor does he make a serious argument in his briefs on appeal, 
that Attorney X actually knew at some earlier stage about 
Doe's involvement. Gantt presents no evidence that Attorney 
X failed to disclose any knowledge of the conflict in order to 
maximize his fee. Thus, we reject as unsupported the sug-
gestion that Attorney X knew of Doe's activities at the same 
time that he represented Gantt, and that Attorney X inten-
tionally delayed informing the other parties of this informa-
tion until after his representation of Gantt had ended.

 We also reject the suggestion that Attorney X's desire to 
maximize his fees itself constituted an "actual conflict." As a 
theoretical matter, it is possible for a conflict to arise when a 
criminal defendant's interests are adverse to his or her 
lawyer's pecuniary interests. See Daniels v. United States, 
54 F.3d 290, 294-95 (7th Cir. 1995) (remanding for evidentiary 
hearing on defendant's claim that lawyer pressured defendant 
into accepting plea); Winkler v. Keane, 7 F.3d 304, 307-08 
(2d Cir. 1993) (concluding that contingency fee created an 
actual conflict of interest for trial counsel). But the claim 
that Attorney X attempted to maximize his fee by encourag-
ing Gantt to plead guilty makes no sense, because Attorney X 


presumably would have earned a larger fee if, rather than 
entering a guilty plea, Gantt had decided to proceed with a 
trial with Attorney X as his counsel. Gantt offers nothing to 
contradict the obvious.

 In sum, Gantt's claim of ineffective assistance fails under 
the Cuyler test, because there is no showing of an actual 
conflict, nor is there any showing that any alleged conflict 
adversely affected Attorney X's performance.

 B.The Challenge to the Denial of 30-Day Continuance

 Gantt also argues that the District Court committed revers-
ible error in granting him only a two-day continuance for the 
start of his trial, from February 3, 1997, to February 5, 
rather than the requested 30-day continuance. Attorney 
Jones filed the motion for the continuance on January 31, 
1997--three days before the scheduled start of appellant's 
trial--claiming that he needed the extra time to obtain an 
expert witness and "prepare an adequate defense." Motion 
for Continuance, Crim. No. 96317-02(JRR) (filed Jan. 31, 
1997) ("Continuance Motion"). Jones noted in the motion 
that he had not received Gantt's files from Attorney X until 
January 27, 1997, at which time Jones was engaged in a trial 
in an unrelated case. See id. Jones further noted that on 
January 29, 1997, he was advised by Government counsel of 
"crucial information that would have a major impact on 
defendant's trial strategy," id.--that is, that Gantt had made 
incriminating statements in the debriefing. In granting only 
a two-day continuance, the District Court explained that it 
simply did not have another opening on its calendar within 
the next 90 days.

 The Supreme Court has made clear that "[n]ot every 
restriction on counsel's time or opportunity to investigate or 
to consult with his client or otherwise to prepare for trial 
violates a defendant's Sixth Amendment right to counsel[,]" 
as "judges necessarily require a great deal of latitude in 
scheduling trials." Morris v. Slappy, 461 U.S. 1, 11 (1983). 
In short, "[a] trial judge enjoys great discretion in ruling on a 
motion for a continuance," and such rulings are reviewed only 
to determine "whether the judge clearly abused his discre-


tion." United States v. Poston, 902 F.2d 90, 96 (D.C. Cir. 
1990). Among the factors to be weighed by a court in 
considering a motion for a continuance are:

 the length of the requested delay; whether other contin-
 uances have been requested and granted; the balanced 
 convenience or inconvenience to the litigants, witnesses, 
 counsel, and the court; whether the requested delay is 
 for legitimate reasons, or whether it is dilatory, purpose-
 ful, or contrived; whether the defendant contributed to 
 the circumstance which gives rise to the request for a 
 continuance; whether the defendant has other competent 
 counsel prepared to try the case, including the consider-
 ation of whether the other counsel was retained as lead 
 or associate counsel; [and] whether denying the continu-
 ance will result in identifiable prejudice to defendant's 
 case, and if so, whether this prejudice is of a material or 
 substantial nature.

United States v. Burton, 584 F.2d 485, 490-91 (D.C. Cir. 
1978) (footnotes omitted); see also Poston, 902 F.2d at 97. In 
deciding whether the District Court abused its discretion in 
denying a request for a continuance, the appellate court must 
assess "the reasons presented to the trial judge at the time 
the request is denied," Ungar v. Sarafite, 376 U.S. 575, 589 
(1964), and remain mindful that trial judges necessarily re-
quire great latitude in scheduling trials.

 On the record before us, we conclude that the District 
Court acted within its discretion in denying the request for a 
30-day continuance. Gantt's second defense counsel told the 
Court when he took over the case on January 22, 1997, that 
he was ready to go to trial. Thus, it was not unreasonable for 
the trial judge to view with skepticism the reasons proffered 
by defense counsel for the 30-day continuance. Moreover, 
the District Court indicated it would have been greatly incon-
venienced by the long continuance, in part because the Court 
had relied upon defense counsel's statement of readiness 
when the Court approved Jones' replacement of Attorney X 
in the case. See Hearing Tr. (1/31/97) at 2, 13. Furthermore, 
the trial court knew that Attorney X "had complete discov-


ery" when he moved to withdraw as counsel; that Attorney X 
indicated that, if necessary, he would be prepared to go to 
trial on the original date; and that all of Attorney X's files 
and discovery were available to Jones. Motion to Withdraw, 
at 2. Although the Court's concern about its docket is not 
dispositive of the question of whether to grant a continuance, 
see Ungar v. Sarafite, 376 U.S. at 589, the trial judge could 
legitimately question the reasons for delay proffered by de-
fense counsel in light of counsel's earlier attestations of 
readiness.

 It is also noteworthy that Gantt's defense counsel made no 
specific proffer justifying a need for more time. Counsel 
suggested that his primary motivation for seeking the contin-
uance was his finding out about the incriminating statements 
made by Gantt during the November 27, 1997, debriefing, 
which he claimed "totally destroy[ed] the trial strategy [he] 
had prepared." Hearing Tr. (1/31/97) at 5. However, counsel 
did not articulate to the District Court, nor does he demon-
strate on appeal, any "identifiable prejudice" that is "material 
or substantial [in] nature," Burton, 584 F.2d at 491, resulting 
from the denial of the continuance. Defense counsel effec-
tively conceded to the District Court that the "problem" 
posed by the debriefing would not "get any better" with the 
passage of a month. Hearing Tr. (1/31/97) at 5. Defense 
counsel filed a motion in limine just before trial, seeking to 
prevent the use of the debriefing statements for purposes of 
impeachment during the trial, but Gantt does not now argue 
that the District Court erred in denying the motion and 
allowing the Government to use the debriefing material, nor 
does Gantt explain how the motion in limine could have 
improved with time. Moreover, as discussed above, Gantt 
makes no serious argument that he would have declined to 
engage in the debriefing session had it been known at the 
time that Doe had been questioned by prosecutors.

 Other arguments by Gantt similarly fail to show prejudice 
resulting from the District Court's denial of the 30-day 
continuance. In claiming in his motion for a continuance that 
he wanted time to "obtain the needed expert," Continuance 
Motion, defense counsel presumably was referring to his 


desire to obtain a witness in order to challenge the Govern-
ment's fingerprint evidence. Gantt has renewed this argu-
ment on appeal, asserting that the Government's fingerprint 
expert found only 13 points of comparison between defen-
dant's prints and prints recovered by the Government in 
connection with the February 1995 incident, where the aver-
age fingerprint has between 75 and 150 comparable charac-
teristics. See Appellant's Br. at 10-11; Reply Br. at 5. 
However, at no point in the proceedings has appellant ex-
pressly claimed that an expert witness, in light of these facts, 
would testify that the Government's fingerprint evidence was 
unreliable. Thus, Gantt's claim that the Government's finger-
print evidence could have been rebutted remains entirely 
speculative. See Poston, 902 F.2d at 98 ("Mere assertions 
regarding the utility of prospective testimony do not provide 
a sufficient basis to compel a continuance" where there is no 
indication that the "testimony would have been material and 
favorable."). In any event, Gantt's attack on such evidence 
does not account for other evidence--such as videotape evi-
dence--demonstrating his involvement in a conspiracy, and 
the fact that the drugs were tossed from Minnick's car during 
the chase.

 Gantt also makes passing reference on appeal, as he did 
before the District Court, to the trial counsel's need for time 
to "interview a government witness" prior to trial. Appel-
lant's Br. at 21; see also Hearing Tr. (1/31/97) at 13. This 
argument is unconvincing, given that Jones did not articulate 
at the pretrial hearing what witness he sought to interview 
and what his line of inquiry would be. See Poston, 902 F.2d 
at 98. Gantt's complaint that Jones was unable to review all 
of the Government's exhibits before trial, see Appellant's Br. 
at 22-23; Reply Br. at 6, is likewise vague and conclusory. 
Although the Government does not dispute that it waited 
until January 30, 1997, to disclose certain evidence obtained 
from electronic surveillance, and to request further finger-
printing of Gantt, see Continuance Motion, Gantt provides no 
persuasive argument that this burden was significant in the 
context of the trial.


 Gantt's counsel makes one last argument in support of 
Gantt's contention that he was wrongly denied a 30-day 
continuance. At oral argument, defense counsel urged that, if 
the District Court had found out about Attorney X's potential 
conflict before trial, the Court would have granted a longer 
continuance to whomever took over Gantt's case. Thus, the 
argument goes, it would be unfair to deny Gantt a new trial 
simply because the trial judge did not have access to all 
relevant information at the time the judge denied the longer 
continuance. Indeed, we do not know whether the District 
Court would have been more sympathetic to Jones' request 
for a continuance if it knew that Attorney X had a conflict in 
the case. Nevertheless, the possibility that the Court would 
have acted differently under these circumstances does not 
demonstrate that extra time would have materially benefitted 
appellant. When all is said and done, we can discern no 
prejudice resulting from the District Court's denial of the 
continuance.

 C.Challenge to District Court's Response to Jury's Video 
 Request

 Gantt's final challenge to his conviction is his claim that the 
District Court committed reversible error by allowing the 
jury to view only two one-hour video tapes introduced into 
evidence by the Government. At trial, the Government intro-
duced 72 hours of video tapes--exhibits number 31 and 29--
which were taken, in part, on the evening of February 1, 
1995, of the front door and window of the store visited by 
Gantt and Minnick. See Trial Tr. (2/5/97) at 182. Later, the 
Government introduced two "one-hour segments from the 72-
hours"--exhibits 30 and 32. Id. at 374. The Government 
played the shorter tapes, exhibits 30 and 32, for the jury 
during trial, see id. at 383, but did not play the longer tapes. 
After the parties' closing arguments, the trial judge told the 
jury that for technical reasons it would not have access to any 
of the video tapes during deliberations unless the jury made a 
special request. During the deliberations, the Court received 
a note from the jury that said: "May we please see the video 
on the small T.V." Trial Tr. (2/7/97) at 448. The trial judge 
then made arrangements for the jury to view only the two 


one-hour video tapes, stating that he did not want the jury 
"getting into the 72-hour versions." Id. at 454.

 Because Gantt's counsel did not object to the District 
Court's arrangements for the video tapes at trial, we review 
for plain error. See United States v. Olano, 507 U.S. 725, 
733-36 (1993). Under this standard, "the court is to deter-
mine: '(1) whether there is unwaived legal error, (2) whether 
the error is "plain" or "obvious" under current law and (3) 
whether the error was prejudicial.' " United States v. Win-
stead, 74 F.3d 1313, 1319 (D.C. Cir. 1996) (quoting United 
States v. Warren, 42 F.3d 647, 657 (D.C. Cir. 1994)). We also 
inquire whether the alleged error "seriously affects the fair-
ness, integrity or public reputation of judicial proceedings." 
Olano, 507 U.S. at 736 (internal quotation omitted).

 Gantt argues that the District Court's decision with regard 
to the tapes usurped the jury's role as fact-finder and thereby 
deprived appellant of his Constitutional right to trial by jury. 
We disagree. The District Court's decision was neither 
surprising nor problematic given the circumstances in which 
the jury made its request: the jury saw only the shorter 
tapes at trial; the shorter tapes were condensed from the 
longer tapes; and the jury asked only that it "see the video." 
In this situation, there was no requirement that the District 
Court give the jury the longer tapes. Had an objection been 
raised and an issue framed, suggesting either that the trial 
judge had misunderstood or ignored the jury's request for the 
longer tapes, or that the jury would be misled by viewing only 
the shorter tapes, then a different question would be posed. 
But no such question has been raised. Indeed, Gantt can 
point to no prejudice that he suffered because of the jury's 
failure to view the longer tapes. In short, nothing that the 
trial judge did amounted to error, much less "plain error."

 III. Conclusion

 For the foregoing reasons, appellant's conviction is af-
firmed.